234 P.3d 214 (2010)
FRIENDS OF CEDAR PARK NEIGHBORHOOD, a Washington non-profit corporation, Appellant.
v.
CITY OF SEATTLE and Widgeon, LLC, Respondents.
No. 63338-4-I.
Court of Appeals of Washington, Division 1.
May 17, 2010.
Publication Ordered July 1, 2010.
*215 Peter L. Buck, Randall P. Olsen, The Buck Law Group PLLC, Seattle, WA, for Appellant.
Elizabeth E. Anderson, Seattle City Attorney's Office, Melody B. McCutcheon, Hillis Clark Martin & Peterson, Seattle, WA, for Respondent.
SCHINDLER, J.
¶ 1 The City of Seattle Department of Planning and Development (DPD) approved a short subdivision application to subdivide a 40,000 square-foot parcel of land in the Cedar *216 Park neighborhood into four single family lots. Friends of Cedar Park Neighborhood (Cedar Park) appeals the decision to approve the subdivision under the Land Use Petition Act (LUPA), chapter 36.70C RCW. Cedar Park argues (1) that neither the hearing examiner's determination that DPD adequately addressed drainage, nor the modified drainage condition imposed by the hearing examiner is supported by substantial evidence, (2) that the hearing examiner erred in concluding DPD correctly calculated the number of lots allowed under the Seattle Municipal Code (SMC), and (3) the short subdivision does not comply with the requirement that the public interests are served by permitting the proposed subdivision. Because substantial evidence supports the hearing examiner's determination that the drainage review and conditions are adequate, and the hearing examiner did not err in approving the short subdivision application to divide the property into four lots or in concluding the public interest is served, we affirm.

FACTS
¶ 2 In 2007, Widgeon, LLC, (Widgeon), filed a short subdivision application to subdivide a 40,015 square-foot parcel of property located in the Cedar Park neighborhood in northeast Seattle. The property is zoned single family residential requiring a minimum of 9,600 square feet for each single family residence.
¶ 3 The site is 194 feet in depth and overlooks Lake Washington. The west 103 feet of the property fronts along 42nd Avenue NE. The eastern portion of the property contains a steep slope and wetlands with grass, trees, and shrubs. The City of Seattle (the City) designated the steep slope and wetland areas of the property as an Environmentally Critical Area (ECA). The steep slope contains an upper slope, a moderately sloping bench with a sewer line, and a lower slope that ends in a ditch along the Burke Gilman Trail. The upper slope is stable, but the lower slope is a potential and known landslide area. The western part of the property near 42nd Avenue NE is relatively flat and is currently developed with a single family residence, a carport, and an accessory structure.
¶ 4 The proposed short plat application subdivides the property into four single family lotsLot A, 10,261 square feet, Lot B, 10,547 square feet, Lot C, 9,603 square feet, and Lot D, 9,603 square feet. Lots A and B front along 42nd Avenue NE. Lots A and B are connected to the eastern portion of the property containing the unbuildable ECA by two six-inch strips of land along the southern and northern edges of the two lots. Lots C and D are rectangular shaped interior lots. A 10 foot by 131 foot easement provides roadway access to lots C and D. As configured, each of the four lots exceeds the Seattle Municipal Code (SMC) minimum lot size requirement of 9,600 square feet.
¶ 5 In support of its subdivision application, Widgeon submitted a report prepared by geotechnical engineering firm Tubbs Geosciences. The "Geotechnical Conditions Residential Property, 13216-42nd Avenue NE, Seattle, Washington" report addresses the geological, topographic and landslide hazard conditions and the impact on the ECA of the proposed subdivision. The stated purpose of the report is to determine whether the site and soils are suitable for the proposed subdivision and whether the proposed development would have an adverse impact on slope stability. The report is based on observations and soil analysis conducted over a seven month period.
¶ 6 The Tubbs Geosciences report concludes that the "property is suitable for the proposed development using appropriate conventional design and construction procedures." The report recommends directing water away from the steep slope area in one of two ways: "all water from roofs and other impervious surfaces be conveyed to the existing sewer, or be infiltrated at least 50 feet from the top of the steep slope." The report also recommends "footings for structures adjacent to the steep slope be set back at least 25 feet from the face of that slope."
¶ 7 During the public comment period, DPD considered over 80 comments about the proposed short subdivision. The primary concerns were protection of the ECA, protection of views, changing the character of the *217 neighborhood, landslide potential, drainage issues, and the unusual configuration of the lots as an "attempt to bypass zoning regulations."
¶ 8 DPD analyzed compliance of the proposed short subdivision with the requirements of the SMC, including access, adequacy of drainage, impact of the proposed development on the ECA, and whether the public use and interests were served. In analyzing the environmental impacts of the proposed subdivision under the State Environmental Policy Act (SEPA), chapter 43.21C RCW, DPD determined that the proposal did not have a significant adverse impact on the environment and issued a Determination of Nonsignificance (DNS).
¶ 9 The "City of Seattle Analysis and Decision of the Director of the Department of Planning and Development" concludes that subject to a number of conditions, the short subdivision proposal meets the requirements of the SMC and protects the ECA. DPD imposed conditions Widgeon must meet prior to issuance of a master use permit and building including the requirement to submit a drainage control plan that meets the requirements of the Stormwater, Grading and Drainage Control Code and show that all water from roofs and other impervious surfaces are diverted to drainage collection lines in the 42nd Avenue Northeast right of way. The DPD decision also states that "additional information showing conformance with applicable ordinances and codes (ECA Ordinance, the Stormwater, Grading and Drainage Control Code, and DR 33-2006) will be required prior to issuance of building permits."
¶ 10 Cedar Park appealed the DNS determination by DPD under SEPA and the DPD decision to approve the short plat to the City of Seattle hearing examiner. Prior to the hearing, Cedar Park abandoned its appeal of the DNS determination under SEPA.
¶ 11 At the hearing, Cedar Park argued that DPD failed to address the adequacy of drainage and erred in imposing a drainage condition that requires diversion of water to drainage collection lines that do not exist at 42nd Avenue NE. Cedar Park also argued that the access easement and calculation of the number of lots did not meet the requirements of the SMC. In addition, Cedar Park claimed that DPD erred in determining the proposed short subdivision configuration serves the public use and interests as required under the SMC.
¶ 12 During the two-day hearing, Cedar Park presented the testimony of four witnesses. Three of the Cedar Park witnesses have backgrounds in architecture or urban planning. Widgeon and the City presented the testimony of lead DPD planner Catherine McCoy, senior DPD land use planner Williams Mills, DPD geotechnical engineer William Bou, and the geotechnical engineer who prepared the Tubbs Geosciences report, Dr. Donald Tubbs. Widgeon also presented evidence showing that the City had approved other similar subdivisions in the Cedar Park neighborhood. Approximately 45 exhibits were admitted during the course of the hearing.
¶ 13 In a ten-page written decision, the hearing examiner affirmed the decision to approve the short plat subdivision, but modified the drainage condition imposed by DPD.
¶ 14 Cedar Park filed a LUPA petition in superior court challenging the hearing examiner's decision to approve the short subdivision. The superior court denied the appeal.

ANALYSIS
¶ 15 LUPA provides the exclusive means of obtaining judicial review of land use decisions, subject to statutory exceptions not applicable here. RCW 36.70C.030; Twin Bridge Marine Park, LLC v. Dep't of Ecology, 162 Wash.2d 825, 854, 175 P.3d 1050 (2008).
¶ 16 The court may grant relief under LUPA only if the party seeking relief has carried the burden of establishing that one of the standards set forth in RCW 36.70C.130(1) is met. RCW 36.70C.130(1) provides, in pertinent part:
(1) The superior court, acting without a jury, shall review the record and such supplemental evidence as is permitted under RCW 36.70C.120. The court may grant relief only if the party seeking relief has carried the burden of establishing that one *218 of the standards set forth in (a) through (f) of this subsection has been met.
...
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law, by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts; ...
¶ 17 In a LUPA appeal, we review the decision of the "local jurisdiction's body or officer with the highest level of authority to make the determination...." RCW 36.70C.020(1); Citizens to Preserve Pioneer Park LLC v. City of Mercer Island, 106 Wash.App. 461, 474, 24 P.3d 1079 (2001). Here, we review the decision of the hearing examiner based on the administrative record. Pavlina v. City of Vancouver, 122 Wash.App. 520, 525, 94 P.3d 366 (2004).

Drainage
¶ 18 Cedar Park contends that under RCW 36.70C.130(1)(c), the hearing examiner's determination that DPD adequately addressed drainage is not supported by substantial evidence. Cedar Park also contends substantial evidence does not support the modified drainage condition imposed by the hearing examiner.
¶ 19 When reviewing a challenge to the sufficiency of the evidence under RCW 36.70C.130(1)(c), we look to whether there is "`a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" Benchmark Land Co. v. City of Battle Ground, 146 Wash.2d 685, 694, 49 P.3d 860 (2002) (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998)). The court must "view all the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact finding authority...." Peste v. Mason County, 133 Wash.App. 456, 477, 136 P.3d 140 (2006). We defer to the hearing examiner's assessment of the "credibility of witnesses and the weight to be given reasonable but competing inferences." State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce, 65 Wash.App. 614, 618, 829 P.2d 217 (1992).
¶ 20 In determining whether to grant, condition, or deny a short plat, DPD must consider the "[a]dequacy of drainage, ..." SMC 23.24.040(A)(3). Cedar Park argued that the drainage review for the short subdivision and the drainage conditions DPD imposed were inadequate for two reasons. First, Cedar Park pointed out that the DPD drainage condition required diversion to drainage collection lines on 42nd Avenue NE when in fact, that drainage system is a ditch and culvert system. Second, Cedar Park asserted that the drainage condition imposed by DPD was inconsistent with the recommendation of DPD drainage reviewer Kevin Donnelly.
¶ 21 DPD drainage reviewer Donnelly recommended that water from impervious surfaces would need to be detained on site before discharge to a drainage system. The hearing examiner's finding states:
DPD's drainage review comments on the proposal stated that there was no record of the current method of stormwater control, and that new construction would be `required to provide detained discharge to the ditch and culvert system on the west side of 42nd NE.' Exhibit 31. This would require water from impervious surfaces to be detained on-site before being discharged into the drainage system, thereby moderating peak flows.
However, DPD imposed the following drainage plan condition:
Submit for approval by DPD a drainage control plan prepared by a licensed civil engineer meeting the requirements of the City's Stormwater, grading and Drainage Control Code. The drainage plans should demonstrate diversion of all water from roofs and other impervious surfaces to drainage collection lines in the 42nd Avenue Northeast right-of-way, in concurrence with the recommendations of the geotechnical *219 report (Tubbs Geosciences, dated November 1, 2006 or later).
¶ 22 The hearing examiner addressed Cedar Park's assertion and recognized the discrepancy between Donnelly's recommendation and the condition imposed by DPD.
The Appellant asserts that the Director's decision is clearly erroneous as to drainage, in that it failed to address the adequacy of drainage and imposed a drainage condition requiring diversion of water to drainage collection collection lines in 42nd Avenue Northeast where no such collection lines exist. The Appellant's lay witnesses on drainage gave useful information about their observations of stormwater drainage in the neighborhood. But the drainage study, Exhibit 26, and testimony from the Applicant's and City's geotechnical engineers establish that water from future houses and other impervious surface on the site will not drain directly onto the steep slope or result in slope instability. Therefore, the Director's decision was not shown to be clearly erroneous as to the adequacy of drainage. The Appellant did point out a discrepancy between the Director's condition and DPD's recommendation on drainage, and the condition will be modified to eliminate this discrepancy.
¶ 23 The hearing examiner modified the drainage condition recommended by DPD. As modified, the condition largely mirrors Donnelly's comments and requires a drainage plan that detains water and provides for discharge away from the steep slope. Prior to issuance of a master use permit and a building permit, under the modified drainage condition Widgeon must submit a drainage control plan for approval by DPD that demonstrates:
detention of all water from roofs and other impervious surfaces on site and discharge to the ditch and culvert system on the west side of 42nd Avenue Northeast, or if acceptable to DPD, either conveyance to the existing sewer or infiltration at least 50 feet from the top of the steep slope.
¶ 24 On appeal, Cedar Park contends that because the Tubbs Geosciences report is a geotechnical report, not a drainage study, and none of the witnesses who testified were drainage experts, the hearing examiner's determination that DPD adequately addressed drainage is not supported by substantial evidence. Cedar Park also maintains that since there is no specific drainage plan or design in place, substantial evidence does not support the finding that water from the proposed construction will not impact the steep slope.
¶ 25 The hearing examiner considered the testimony and the exhibits concerning adequacy of the drainage review by DPD and the recommended drainage conditions. DPD land use planner McCoy explained that the proposal went through a number of internal reviews, including drainage and a geotechnical review. McCoy testified that after consultation with drainage reviewer Donnelly, approval was conditioned on submission of a comprehensive drainage plan.
¶ 26 Although the Tubbs Geosciences report was a geotechnical report and not a drainage study, the report and the testimony at the hearing demonstrate that the geotechnical analysis and drainage are intertwined. As Dr. Tubbs explained, his primary task was to assess the impact of development on the parcel, particularly with respect to the ECA and slope stability. Landslide potential and drainage were critical factors in determining the geotechnical impact of the proposed development. Dr. Tubbs testified that assuming drainage is directed away from the steep slope and his recommendations for setbacks are followed, the proposed development would not adversely impact the ECA steep slope area.
¶ 27 DPD geotechnical reviewer Bou also testified that the purpose of geotechnical review is to assess the impact of the proposal on the ECA and slope stability, and the most important considerations are drainage diversion and setbacks. Bou testified that the recommendations in the Tubbs Geosciences report to either convey water to the drainage system on 42nd Avenue NE or infiltrate the water 50 feet away from the steep slope, were "very proper recommendations" that protected the landslide-prone areas.
¶ 28 While Cedar Park points to Bou's testimony that he didn't "deal with drainage," that portion of his testimony is taken *220 out of context. Bou made the comment in the context of explaining that the design of public drainage systems was not within the scope of his expertise. Bou also expressly deferred to the drainage reviewer in making certain assessments, including determination of the preferred method and location to connect to the public system. As reflected in the hearing examiner's decision, both Dr. Tubbs and Bou testified that either a diversion system or an infiltration system set back 50 feet from the steep slope, would minimize the impact of the proposed development and protect slope stability.
DPD's geotechnical engineer also reviewed the Applicant's geotechnical engineer report and agreed with the report's recommendations on construction and drainage measures to maintain slope stability. At hearing, DPD's engineer explained that geotechnical review at the short subdivision stage looks at whether the project is feasible in light of existing conditions, with more detailed review being required at the building permit stage. He was not concerned by the possibility that some water from 42nd Avenue NE drains across the site and adjacent properties because it would originate at least 500 yards from the slope rather than being discharged directly onto it.
¶ 29 Substantial evidence supports the hearing examiner's determination that DPD adequately addressed drainage. However, the hearing examiner recognized the need to modify the drainage condition.
¶ 30 By permitting a potential drainage system that does not involve a detention system that diverts water to a ditch and culvert system, Cedar Park claims the modified condition imposed by the hearing examiner subjects the neighborhood to unacceptable "further uncertainty" with respect to the specific drainage system that will be required for new construction. Cedar Park also argues that the hearing examiner cannot find that the water will be diverted away from the slope until a specific plan is in place.
¶ 31 As previously noted, prior to issuance of a master use permit and a building permit, the modified condition imposed by the hearing examiner requires Widgeon to:
Submit for approval by DPD a drainage control plan prepared by a licensed civil engineer meeting the requirements of the City's Stormwater, Grading and Drainage Control Code. The drainage plan must demonstrate detention of all water from roofs and other impervious surfaces on site and discharge to the ditch and culvert system on the west side of 42nd Avenue Northeast or, if acceptable to DPD, either conveyance to the existing sewer or infiltration at least 50 feet from the top of the steep slope.
¶ 32 Any drainage plan permitted under the modified condition, must divert water away from the ECA. The crux of Cedar Park's challenge to the modified condition primarily reflects dissatisfaction with the City's multi-step process. Cedar Park wants more information at the short plat subdivision approval stage about the specific drainage system that will be designed, rather than at the master use and building permit stage. But according to the evidence, the short plat review process involves conceptual review, looking at the "feasibility" of the proposal subdivision and submission of a drainage plan is not required to obtain approval of a subdivision.
¶ 33 Here, the City determined the proposed short subdivision development is feasible, but that issuance of a master use permit and a building permit is conditioned on submission of a drainage control plan that the City must approve. In order to obtain a master use and building permit, the drainage system must comply with the drainage condition imposed, meet the SMC requirements, and be approved by DPD. Substantial evidence supports the hearing examiner's conclusion that DPD adequately addressed drainage substantial evidence also supports the modified drainage condition imposed by the hearing examiner.

Lot Size
¶ 34 Cedar Park also claims that calculation of the required access easement and the number of lots violates SMC 25.09.240(e)(1). DPD determined that the proposal meets the minimum lot size requirement *221 by excluding the access easement area and including the ECA area as permitted under the SMC.
¶ 35 SMC 25.09.240(E)(1) provides, in pertinent part:
In computing the number of lots a parcel in a single family zone may contain, the Director shall exclude the following areas:
1. Easements and/or fee simple property used for shared vehicle access to proposed lots that are required under Section 23.53.005 [requiring that at least 10 feet of a lot either abuts a roadway or a vehicle access easement].
¶ 36 Cedar Park asserts the hearing examiner's decision that DPD correctly calculated the number of lots is a "clearly erroneous application of the law to the facts" under RCW 36.70C.130(1)(d). The clearly erroneous test under RCW 36.70C.130(1)(d) allows this court to reverse only if "left with a definite and firm conviction" that the examiner's decision is erroneous. Milestone Homes, Inc. v. City of Bonney Lake, 145 Wash.App. 118, 126, 186 P.3d 357 (2008).
¶ 37 According to the testimony of DPD senior land use planner Mills, the proposal meets the requirements of SMC 25,09.240(e)(1). The 10 foot wide by 130 foot easement providing vehicle access to parcels C and D is approximately 1,318 square feet. Subtracting 1,318 from the total parcel area of 40,014 square feet results in sufficient square footage for four lots that meet the minimum lot size requirement of 9,600 square feet.
¶ 38 But Cedar Park argues that because the homes that are built will have driveways that require a certain turning radius, additional areas of "shared vehicle access" must be deducted. Cedar Park presented a number of illustrative diagrams at the hearing that depict different configurations of the location of houses, garages, and driveways. Based on these configurations, Cedar Park claimed that an additional 570 square feet must be deducted, and the area left is insufficient to create four lots.
¶ 39 The hearing examiner rejected Cedar Park's argument that the calculation of the easement and the number of allowable lots was erroneous.
The Appellant alleges that the Director's decision is clearly erroneous as to the size of the required access easement and the resulting calculation of the number of lots permitted on the site. The Appellant's argument assumes placement of garages of specific sizes, in specific locations on Parcels C and D, and states that the easement length would extend only 15 feet in front of these hypothetical garages. The Appellant then assumes a specific turning radius and resulting turning area required for accessing the hypothetical garages, and states that this required area constitutes "shared vehicular access" under the Code that must be deducted from the total area in calculating the number of lots allowed. Under the Appellant's hypothetical, the remaining area would be sufficient for three, rather than the proposed four lots. The Appellant's argument is built on speculation and does not reflect the only possible configuration of development on the lots. See Department of Planning and Development Closing Argument at 5-6. At the short subdivision stage, the location of houses, garages, and driveways on the lots is unknown, as it is here. The concern in reviewing a short subdivision is access to the lots being created, and the Applicants have demonstrated access to Parcels C and D that meets all Code requirements.
The hearing examiner did not err in rejecting Cedar Park's calculation based on the hypothetical configurations. The record supports the calculation of the easement to provide necessary access to the interior lots and that the four lots meet the requirements of the SMC.[1]
¶ 40 Cedar Park also contends that because the SMC requires a 20 foot wide easement, the 10 foot wide access easement is too narrow. Under SMC 23.53.025(A) and (B) an access easement serving three or four lots must be 20 feet wide, but an easement serving *222 one or two lots can be 10 feet wide. The testimony at the hearing supports the conclusion that because the 10 foot wide easement only serves the two interior lots and Lots A and B abut the roadway, the lots do not require a 20 foot access easement.

Public Use and Interests
¶ 41 In deciding whether to approve or deny a short plat subdivision, SMC 23.24.040(A)(4) requires DPD to consider whether "the public use and interests are served by permitting the proposed division of land."[2] Cedar Park argues that the determination that the proposed subdivision serves the public use and interests constitutes an erroneous interpretation of the law and a "clearly erroneous application of the law to the facts" under RCW 36.70C.130(1)(b) and (d).
¶ 42 Under RCW 36.70C.130(1)(b), an erroneous interpretation of law presents a question of law that this court reviews de novo. Milestone, 145 Wash.App. at 126, 186 P.3d 357. As previously noted, this court will reverse a clearly erroneous application of the law to the facts only if "left with a definite and firm conviction" that the decision is erroneous. Milestone, 145 Wash.App. at 126, 186 P.3d 357.
¶ 43 Cedar Park contends that because the "bizarre" lot configuration contravenes the intent and purpose of the minimum lot size requirement, approval of the short subdivision does not serve the public interests requirement under the SMC.[3] Although admittedly not prohibited by the SMC, Cedar Park argues that by using functionally noncontiguous parcels to meet the 9,600 square foot lot requirement, the proposal "contravenes the intent of the Code and supplants the public's reasonable expectation for density."
¶ 44 DPD concluded that the short subdivision meets the requirements for a short subdivision under SMC 25.09.240 and ECA regulations and that the proposal served the public interests by protecting the ECA and creating "the potential for additional housing opportunities in the City." The hearing examiner concluded the proposed subdivision served the SMC public use and interests requirement because the SMC allows using the ECA to calculate the number of lots:
Finally, the Appellant claims that the Director erred in determining that the short subdivision meets the public use and interests under SMC 23.24.040. The Appellant cites testimony on the Comprehensive Plan, and the predictability provided by minimum lot sizes, as demonstrating that increasing density in the SF 9600 zone does not meet the public use and interests. However, this short subdivision does not increase density in the zone. As discussed above, the original parcel contains sufficient square footage for four lots of at least 9600 square feet. Because a significant amount of the property is occupied by a steep slope ECA, and because the Code expressly allows inclusion of the ECA in lot area calculation in this case, the density may appear to exceed SF 9600, but it does not actually do so. The subdivision does provide additional housing in compliance with existing Code requirements.
¶ 45 Cedar Park's primary argument is that notwithstanding compliance with the SMC, and the decisions in Norco Constr., Inc. v. King Cy., 97 Wash.2d 680, 649 P.2d 103 (1982) and Carlson v. Town of Beaux Arts Village, 41 Wash.App. 402, 704 P.2d 663, 665 (1985), the hearing examiner should have denied the proposal as contrary to the public interests. Cedar Park argues that by following the decisions in Norco and Carlson, the City allows Widgeon to exploit a loophole created by the SMC, which is contrary to the purpose of the minimum lot size requirement and does not serve the public interests.
*223 ¶ 46 In Norco, the developer filed an application for preliminary plat approval that complied with the existing code and comprehensive plan. However, the plat conflicted with a proposed amendment to the comprehensive plan that would have increased the required minimum lot size. Because of the conflict with the proposed amendment, the King County Council refused to act on the plat application. The developer unsuccessfully sought to compel the Council to act on its preliminary plat application under the existing regulations. On appeal, the County argued that the proposed change in the comprehensive plan could be considered in determining whether the plat met the "`public use and interest'" requirement under state law. Norco, 97 Wash.2d at 688, 649 P.2d 103.[4]
¶ 47 The Washington State Supreme Court rejected the County's argument. The court adopted the vested rights doctrine and held that compliance with the land use regulations that are in effect when the developer submits a plat application limit the local jurisdiction's discretion in considering a preliminary plat proposal. The court held that denial of a plat application based on the grounds of public use and interest is improper.
[T]o interpret these terms as conferring unlimited discretion upon the Council would make the other sections of the platting statute meaningless and place plat applicants in the untenable position of having no basis for determining how they could comply with the law.
Norco, 97 Wash.2d at 688, 649 P.2d 103.
¶ 48 Similarly, in Carlson, the Town of Beaux Arts Village denied a short plat application that divided a single family parcel into two lots and created an "irregularly-angled, flag-shaped lot...." Carlson, 41 Wash.App. at 407, 704 P.2d 663. The Council denied the application as "not in the best interest" of the Town. Id. On appeal, this court held that because the applicant had complied with the applicable subdivision requirements, and no ordinance prohibited an irregularly shaped lot, the decision was arbitrary and capricious.
To allow the Town Council to deny the application based on `the best interests of the Town's citizens' would put the Carlsons, like the applicants in Norco, in the predicament of having no basis for determining how they could comply with the law. Consequently, we find that the actions of the Town Council were arbitrary and capricious.
Carlson, 41 Wash.App. at 408, 704 P.2d 663.
¶ 49 Cedar Park argues that because the Norco and Carlson allow developers to subvert the intent of the SMC, those decisions should be narrowly construed and applied. Cedar Park contends that because Norco and Carlson predate adoption of the Growth Management Act, chapter 36.70A RCW, those decisions are out of date. However, nothing in the GMA suggests that the determination of whether approval of a subdivision serves the public interest overrides compliance with existing regulations and the vested rights doctrine. To the contrary, recent case law reiterates the Washington Supreme Court's adherence to the vested rights doctrine as set forth in Norco. See, e.g., Abbey Road Group, LLC v. City of Bonney Lake, 167 Wash.2d 242, 218 P.3d 180 (2009).
¶ 50 Washington's vested rights doctrine entitles developers to have a land use proposal reviewed under the regulations in effect at the time a complete application is filed regardless of subsequent changes in land use regulations. Abbey Rd. Group 167 Wash.2d at 250, 218 P.3d 180.[5]
*224 ¶ 51 While Cedar Park contends that interpreting Norco and Carlson as a limitation on the discretion of a local jurisdiction, allows applicants to "exploit loopholes," the remedy is not to abandon the vested rights doctrine, but to seek a legislative change to the SMC.[6] Because the proposed subdivision meets the requirements of the SMC, the City lacked the authority to deny the proposal solely based on the unusual configuration of the lots.
¶ 52 Cedar Park's argument that the subdivision contravenes the intent of the minimum lot size requirement is not supported by the SMC. SMC 25.09.240(B) allows inclusion of the ECA in calculation of the lot size provided that parcels are "divided so that each lot contains an area for the principal structure, all accessory structures, and necessary walkways and for access to this area that are outside all environmentally critical areas and buffers...." Under SMC 25.09.240(E)(2)(a), if this requirement is met, the ECA may be included in determining the allowable number of lots. And, as the hearing examiner pointed out, there is no requirement in the SMC of a functional relationship between lots A and B and the six-inch strips connecting the lots to the ECA.
The Appellant challenges the lot configuration in the proposed short subdivision particularly the six-inch strips connecting the buildable portions of Parcels A and B with the portions covered by the ECA. The Appellant argues that there is no functional relationship between the two parts of Parcels A and B, and that this lot configuration contravenes the intent of the Code to provide predictability in neighborhood development, and therefore fails to meet the public use and interests. The Appellant points to no Code requirement that every part of a lot be `functional'.
¶ 53 Cedar Park's argument is also undermined by evidence in the record of the approval of similar subdivisions in Cedar Park. While other subdivisions do not employ the same lot configuration as here, two of the subdivisions divide large lots into four parcels by building on the western portion of the sites to protect the ECA.
¶ 54 Cedar Park also argues that the proposal is contrary to the public interests because the configuration does not allow the property owner to maintain the property abutting the Burke Gilman Trail. However, land use planner Mills testified that removal of vegetation in the ECA is substantially limited by the SMC, and, therefore, only minimal maintenance is allowed. The hearing examiner also concluded that the SMC substantially limits the amount of maintenance allowed and that such maintenance could be accomplished through an easement or by accessing the steep slope from the trail.
There was testimony to the effect that the lot configuration would make it difficult to maintain the ECA portion of Parcels A and B, but that could be accomplished by means of pedestrian easements across Parcels C and D or access from the Burke Gilman Trail. In any event, the use and maintenance of an ECA would normally be very limited.
¶ 55 In sum, the hearing examiner did not erroneously interpret the law or erroneously apply the law to the facts, in concluding that the proposed short subdivision served the "public use and interests" under the SMC.
¶ 56 Because Cedar Park has not met its burden of showing it is entitled to relief from the hearing examiner's decision under the LUPA, we affirm.

Attorney Fees
¶ 57 Widgeon requests attorney fees under RCW 4.84.370. The prevailing party on appeal of a land use decision is entitled to its attorney fees if that party's decision also *225 prevailed before the agency and in the superior court.[7] RCW 4.84.370(1); Habitat Watch v. Skagit County, 155 Wash.2d 397, 412-413, 120 P.3d 56 (2005). As the prevailing party, subject to compliance to RAP 18.1, Widgeon is entitled to an award of reasonable attorney fees on appeal.[8]
WE CONCUR: LAU and APPELWICK, JJ.
NOTES
[1] Cedar Park reliance on SMC 23.54.030(D)(1) is misplaced. Other than Cedar Park's hypothetical diagrams, there is nothing in the record to show the proposed development will not meet the SMC.
[2] RCW 58.17.060 requires cities to adopt regulations for approval of short subdivisions. And RCW 58.17.110 requires a local government to inquire into the "public use and interest" of a proposal and make written findings as to "whether the public use and interest will be served by the platting of such" division of land. RCW 58.17.110(2). There is no dispute the SMC complies with state law.
[3] Cedar Park also cites to a DPD internal e-mail between McCoy and another land use planner referring to the plat proposal as "creative-in-the-extreme" and "not a pretty sight."
[4] RCW 58.17.110 requires consideration of the "public use and interest" and the "public health, safety, and general welfare...."
[5] The legislature codified the vested rights rule for subdivisions in RCW 58.17.033.

Proposed division of landConsideration of application for preliminary plat or short plat approvalRequirements defined by local ordinance
(1) A proposed division of land, as defined in RCW 58.17.020, shall be considered under the subdivision or short subdivision ordinance, and zoning or other land use control ordinances, in effect on the land at the time a fully completed application for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official.
(2) The requirements for a fully completed application shall be defined by local ordinance.
(3) The limitations imposed by this section shall not restrict conditions imposed under chapter 43.21C RCW.
[6] Cedar Park urges this court to revisit its decision in Carlson and adopt a set of new factors to evaluate whether a land use proposal serves the public interest. However, Cedar Park's proposed factors offer no more predictability and do not address the concerns presented in Carlson. Moreover, even if we were inclined to revisit Carlson, we have no authority to overrule the Supreme Court's decision in Norco. See Nielson v. Wolfkill Corp., 47 Wash.App. 352, 358, 734 P.2d 961 (1987).
[7] RCW 4.84.370 provides in pertinent part:

(1) [R]easonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals ... of a decision by a county, city, or town to issue, condition, or deny a development permit involving a ... plat ... or similar land use decision or approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:
(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town .... and
(b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.
[8] RCW 4.84.370(2) of this statute provides that, "[i]n addition to the prevailing party under subsection (1) of this section, the county, city, or town whose decision is on appeal is considered a prevailing party if its decision is upheld at superior court and on appeal," the City did not request an award of attorney fees.