# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DONALD AND KATHLEEN MILLER, | ) | No. 78528-1-I |
| | ) | |
| Appellants, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| THE CITY OF SAMMAMISH, a | ) | PUBLISHED OPINION |
| Washington municipal corporation, | ) | |
| | ) | |
| Respondent. | ) | FILED: August 19, 2019 |
| | ) | |

MANN, A.C.J. — After learning that Donald and Kathleen Miller systematically filled in and destroyed regulated wetlands on their property, the City of Sammamish (City) commenced a code enforcement action. Over the course of a year, the City issued a notice to comply, posted a stop work order on the property, and finally issued a notice and order to abate and imposed a penalty. The Millers appealed to the City's hearing examiner. The hearing examiner concluded that the Millers violated the Sammamish Municipal Code (SMC), and the superior court affirmed. The Millers appeal arguing that the hearing examiner violated their due process rights, that the penalty order was unconstitutionally vague, and that substantial evidence does not support the hearing examiner's conclusion that there were wetlands on their property.

We affirm.

I.

The Millers own 2.29 acres of residential property located within the Sammamish City limits. Two of the Millers' predecessors, Donald and Ira Morin purchased the property in 1975. Donald Morin testified that he purchased the property for his daughter's horses. He testified that he dug a pond for the horses on the lowest spot on the property and spread the spoils around the perimeter of the pond. Morin testified that the area was dry before he dug the pond and that he continually filled the pond with his garden hose.

The Morins sold the property three years later, in 1978, to Marvin and Vera Federman. The property was described in the 1978 sale as "residential, bare land." The Federmans sold the property to Judy Wendl in 1994. Bankers Trust Company of California foreclosed the property in 1998. The Millers purchased the property in 1999 from Bankers Trust.

In 2005, developer CamWest investigated developing a 38-lot residential subdivision on several parcels, including the Millers' property. The Millers and CamWest entered an agreement allowing CamWest to prepare a feasibility study of the property. CamWest commissioned Talasaea Consultants, Inc. to prepare a sensitive areas report of the Millers' property and adjacent parcels. The Talasaea report identified two areas of the Millers' property as class III wetlands—wetlands K and L. The report identified wetland L as 0.11 acres of palustrine, emergent, saturated wetland primarily composed of mowed lawn vegetation located on the eastern border of the Millers' property. To the southwest of wetland L, the report identified wetland K as 0.12 acres of palustrine, scrub shrub, unconsolidated bottom, permanently flooded,

impounded wetland. The report determined that the farm pond excavated by Donald Morin was included within wetland K.[1] The City's former wetland biologist reviewed and concurred in Talasea's findings in 2006. CamWest did not buy the Millers' property or proceed with the proposed development.

In 2008, the landowner located to the south of the Millers commissioned Altmann Oliver Associates, LLC (AOA) to prepare a critical area study of their property in association with a potential residential development of that parcel. AOA determined that there were two wetlands present on the southern property. AOA also relied upon the Talasaea report to determine that there were three additional wetlands on the properties neighboring the study site, including wetland K on the Millers' property. Using the state wetland rating form, AOA concluded wetland K was a category III wetland. AOA advised its client that the wetland K regulatory buffer would extend onto the client's property. Summit Homes, LLC ultimately developed the property south of the Millers into a residential subdivision. The subdivision includes a native growth protection area along its north edge to encompass the portion of wetland K's required regulatory buffer.

On January 12, 2016, the City's wetland biologist, Kathy Curry, informed the City's code correction officer, Chris Hankins, that she received a complaint that the Millers had been filling and grading wetlands on their property. Curry reported "Wetland K, which encompassed a farm pond, has been entirely filled and that Wetland L, which included a shallow depression, has been graded and filled."

---

[1] The hearing examiner determined that the "pond was not a regulated wetland, but the area surrounding it was, as was Wetland L."

After investigating the complaint, on February 12, 2016, the City informed the Millers by mail that the City had reason to believe unpermitted filling and grading had taken place on the Millers' property. Donald Miller contacted Hankins a couple weeks later and said that over time there has been some filling and clearing activities on his property. Miller "was very terse in his response, saying that 'There are no wetlands on my property.'" Hankins informed Miller that he required permits to continue filling and clearing on his property and that Hankins could help him get into compliance. Miller did not obtain such permits.

The City issued a second letter on April 14, 2016. The letter described three things that, at a minimum, must be done for the Millers to avoid further action against them: (1) have a certified wetland professional complete a wetland delineation report and mitigation plan, (2) complete a critical area review and submit it with a clear and grade permit application, and (3) stop further work until such a permit is issued.

During this time, Summit Homes agreed to purchase the Millers' property. Summit Homes contacted Hankins to determine what Summit Homes had to do to make sure the property was in compliance. The City put its enforcement action against the Millers on hold, under the belief that Summit Homes would get the property into voluntary compliance. The Summit Homes deal ultimately fell through, however, due to the Millers' insistence that "he should not have a wetland on his site."

In September 2016, Hankins again attempted to contact the Millers to get the property into compliance but the Millers refused to comply. Subsequently, in February 2017, the City received another complaint that the Millers were "stockpiling dirt on his property and continuing to fill and spread dirt throughout the site." At that point, Hankins

-4-

visited the property and observed "substantial fill-dirt piles on the property . . . [and] evidence of tracks and exposed dirt in the areas that [the City was] concerned about previously."

On February 10, 2017, the City posted a stop work order on the Millers' property and mailed a letter to the Millers describing the city codes that the Millers were violating and how to bring their property into compliance. The City also issued the Millers a $500 fine for the stop work order and informed the Millers how they could appeal that decision.

After receiving the stop work order, "Mr. Miller did not follow through with any permit applications as required." Therefore, the City issued and recorded a notice and order to abate civil code violations (notice). The City determined that the Millers had committed "multiple code violations by authorizing clearing and grading, including the filling of wetlands and wetland buffers on the property, without obtaining the required permits from the City." The notice informed the Millers what they were required to do to correct the violations. The notice also assessed a $15,000 civil penalty for environmental damage and critical areas ordinance violations, plus daily penalties for every day the property remains noncompliant. The Millers appealed this notice to the City's hearing examiner.

Prior to the hearing, the Millers retained Sewall Wetland Consulting, Inc. to assess their property and review the prior wetland studies. The City retained Nell Lund of the Watershed Company to do the same. The City also asked the Washington State Department of Ecology (Ecology) to review all of the relevant information and determine

whether wetlands had existed on the Millers' property. The Ecology assessment concluded:

> Based on information obtained from the literature review it appears Wetlands K and L existed on this property prior to 2008. The fill material placed since then has eliminated both wetlands. None of the soil pits examined within this fill material by Sewall Wetland Consulting and The Watershed Company meet the three wetland criteria, which is not surprising. Although Ecology does not usually rely on wetland findings more than five years old, the Talasaea delineation is the only on-site description of the wetland conditions that preceded the fill material. Therefore, we concur with the Talasaea delineation of Wetlands K and L on the Miller property.

The hearing examiner held a two-day hearing. The first day of the hearing was held on August 24, 2017. The City presented expert testimony from Nell Lund, and Officer Hankins. The Millers' presented testimony from Don Morin, Don Miller, and expert testimony from Ed Sewall. Due to a scheduling conflict, there was a two-month gap between the two hearing dates. During the interim the Millers continued to fill and grade the property. After Summit Homes dumped 20 truckloads of fill dirt on the Millers' property, the Millers used the fill to create a driveway through wetland L.

The hearing examiner's November 15, 2017, decision concluded that regulated wetlands were present on the Millers' property. The hearing examiner further concluded "[t]here is compelling evidence and testimony that Miller either caused or allowed well in excess of 50 [cubic yards] of dirt to be dumped on [his property] and that he used that dirt to fill in the former pond and low areas where Wetlands K and L had been." The hearing examiner also concluded that the Millers were required to, but did not, have a permit for their filling and grading activities and that their activities were not exempt from permitting requirements.

The Millers petitioned for review of the hearing examiner's decision by the King County Superior Court, under the Land Use Petition Act (LUPA), ch. 36.70C RCW. The superior court denied the petition for review and affirmed the hearing examiner. After unsuccessfully seeking reconsideration, the Millers appeal.

## II.

LUPA allows an individual to appeal the land use decision of a quasi-judicial body, such as the hearing examiner. RCW 36.70C.030, 36.70C.040. To succeed, the party seeking relief has the burden of establishing that one of standards set forth in RCW 36.70C.130(1)(a) through (f) has been met. RCW 36.70C.130(1). As relevant to this appeal, those standards are:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
> (d) The land use decision is a clearly erroneous application of the law to the facts; . . . or
> (f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1).

RCW 36.70C.130(1)(b) and (f) address questions of law and are reviewed de novo. Families of Manito v. City of Spokane, 172 Wn. App. 727, 736, 291 P.3d 930 (2013). Under the substantial evidence standard in RCW 36.70C.130(1)(c), "there must be a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). To prevail under RCW 36.70C.130(1)(c) "requires the court to determine whether a fair-minded person would be persuaded by the evidence of the truth of the challenged finding." Lauer v. Pierce County, 173 Wn.2d

242, 252-53, 267 P.3d 988 (2011). A finding is clearly erroneous under RCW 36.70C.130(1)(d) "when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." Wenatchee Sportsmen Ass'n, 141 Wn.2d at 176.

When reviewing a superior court's decision under LUPA, we "stand[] in the shoes of the superior court and [limit our] review to the record before the local jurisdiction's body or officer with the highest level of authority to make the determination." Mower v. King County, 130 Wn. App. 707, 712-13, 125 P.3d 148 (2005). "Facts and inferences from the evidence are to be viewed in the light most favorable to the party that prevailed in the highest forum exercising fact-finding authority." Families of Manito, 172 Wn. App. at 739-40. We "defer to the hearing examiner's assessment of the credibility of witnesses and the weight to be given reasonable but competing inferences." Friends of Cedar Park Neighborhood v. City of Seattle, 156 Wn. App. 633, 641-42, 234 P.3d 214 (2010) (internal citation omitted).

### III.

The Millers first argue that the hearing examiner's decision violates their constitutional rights and is thus invalid under RCW 36.70C.130(1)(f). The Millers claim the hearing examiner violated their due process rights by refusing to consider "three constitutional defenses to the penalty order." The Millers then contend that, to the extent the hearing examiner did consider their constitutional defenses, it applied the wrong legal standard. We disagree.

-8-

A.

The Millers first assert that the hearing examiner deprived them of their due process rights by refusing to consider whether: (1) the Millers had a protected right to a nonconforming use of their property as pasture for grazing animals, (2) the City's failure to notify the Millers that there were regulated wetlands on their property was fundamentally unfair, and (3) the order was unconstitutionally vague and the penalty was assessed in an ad hoc manner. The Millers are wrong.

Conclusion 5 of the hearing examiner's decision addressed and rejected the Millers' claim that they had a nonconforming agricultural use. The examiner concluded that there was no evidence that the filling and grading had anything to do with agriculture; that the SMC did not exempt agricultural activities, and that "even if" the farm ponds were use that preexisted the SMC, "filling it would not constitute 'maintenance' in any normal meaning of the word."

Conclusion 7 of the hearing examiner's decision addressed and rejected the Millers' claim that the City's failure to notify them of wetlands on their property was fundamentally unfair. The examiner explained that the SMC warns that not all critical areas are fully mapped and that the code "places the responsibility on the applicant to disclose critical areas within a proposed development site."

Conclusions 9, 10, and 11 of the hearing examiner's decision addressed the Millers' argument that the order was unconstitutionally vague and the penalty was assessed in an ad hoc manner. The examiner first explained that the order contained each of the legal requirements of the SMC. The examiner then explained that "Miller criticizes the [order] for not providing sufficient guidance regarding required

corrections . . . The Examiner concurs with the City that it is unrealistic to mandate a specific solution in this case since so many variables are involved." Finally, the hearing examiner explained that the penalty assessment was not ad hoc, but was instead based on application of a longstanding set of City guidelines setting forth the methodology for calculating a fine. He explained that the SMC allowed a penalty of up to $25,000 plus restoration costs for critical area violations and that using the methodology the notice assessed a lower $15,000 penalty.

The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings "as are adequate to safeguard the right for which the constitutional protecting is invoked. If that is preserved, the demands of due process are fulfilled." Anderson Nat. Bank v. Luckett, 321 U.S. 233, 246, 64 S. Ct. 599, 88 L. Ed. 692 (1944); see also Wash. Const. art. I, § 14; Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The record before us demonstrates that the Millers were afforded due process including the opportunity to present witnesses, testimony, exhibits, and oral and written argument. The Millers do not point to any relevant evidence that was excluded or otherwise not reviewed and considered by the hearing examiner.

The Millers rely principally on Johnson v. City of Seattle, 184 Wn. App. 8, 21-22, 335 P.3d 1027 (2014). Johnson involved a claim of a nonconforming use related to illegally parked cars. This court was critical of a provision of Seattle's municipal code that prohibited the Seattle hearing examiner from making factual determinations as to whether the nonconforming use existed—instead requiring the claimant to first seek a determination from the Department of Planning and Development. Johnson, 184 Wn.

App. at 21. And because Johnson was not provided a stay of the hearing examiner's hearing in order to seek relief from the department, the court concluded that Johnson "had no opportunity to present his defense and was provided no procedural safeguards." Johnson, 184 Wn. App. at 22.

Here, in contrast, the SMC does not prohibit the hearing examiner from making a factual determination. Indeed, the hearing examiner did just that: it heard the Millers' evidence and found that while the Millers' predecessor Morin used the property for his daughter's horse, the land was never designated or described as agricultural land. The examiner then concluded that the Millers' filling and grading was not related to an agricultural use.

Contrary to the Millers' claim, each of the three alleged constitutional defenses were addressed, and dismissed by the hearing examiner.[2]

B.

The Millers next contend that even if the hearing examiner considered their claimed nonconforming use, the examiner erred in concluding that they did not have a valid nonconforming use.

---

[2] Citing Exendine v. City of Sammamish, 127 Wn. App. 574, 113 P.3d 494 (2005), the hearing examiner concluded that constitutional arguments were beyond his scope of review. This is likely in response to a fourth constitutional claim raised by the Millers below—that the City's codified penalty provisions exceeded the City's delegated authority. In Exendine, this court explained:

> The Sammamish Municipal Code establishes the office of a hearing examiner. SMC 20.10.020 provides: "The examiner shall act on behalf of the City Council in considering and applying adopted City policies and regulations as provided herein." The city council is a legislative body, and it does not have the power to enforce, interpret, or rule on constitutional challenges. The City Council cannot delegate power it does not have.

Exendine, 127 Wn. App. at 586-87. The hearing examiner correctly concluded that he did not have the authority to determine the constitutional validity of the City's penalty ordinance and the Millers have not advanced that argument to this court.

"Generally, a nonconforming use is a use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the current zoning restrictions applicable to the district in which it is situated." McMilian v. King County, 161 Wn. App. 581, 591, 255 P.3d 739 (2011) (internal citation omitted).

"[T]he initial burden of proving the existence of a non-conforming use is on the land user making the assertion." Van Sant v. City of Everett, 69 Wn. App. 641, 647-48, 849 P.2d 1276 (1993). The landowner has the burden to prove that (1) the use existed prior to the contrary zoning ordinance, (2) the use was lawful at the time, and (3) the applicant did not abandon or discontinue the use for over a year prior to the relevant change. King County Dept. of Dev. & Envtl. Servs. v. King County, 177 Wn.2d 636, 643, 305 P.3d 240 (2013) (citing Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wn.2d 1, 6, 959 P.2d 1024 (1998)). There is no constitutional right to "change, alter, extend or enlarge the existing use," and owners may not modify nonconforming uses without City approval and often a permit. Rhod-A-Zalea, 136 Wn.2d at 7. See also SMC 21A.70.060-.080.

The Millers contend that before the City was incorporated, their predecessor Morin established the pasture and pond on the property for his horses and that the Millers continued to use the pasture and pond in the same way. The Millers further contend that the annual depositing of topsoil and grass seed was an indispensable part of this use, and that the City is prohibited from restricting this agricultural use.

As an initial manner, it is hard to see how filling wetlands is a continuation of using a pasture and a pond to graze and water animals. The Millers were not cited for

-12-

adding small amounts of topsoil or reseeding the pasture, as they now claim, but for bringing large quantities of fill onto their land to fill in two regulated wetlands.[3] Donald Miller admitted that when Summit dumped 20 truckloads of dirt on his property, he used that dirt to construe a driveway that runs through wetland L.

Further, the initial burden was on the Millers to prove the existence of a nonconforming use. But all the Millers showed was how the Morins used the property in the 1970s. The Millers did not demonstrate that the Morins' use of the property for a horse continued over the next 21 years before the Millers purchased the property. The Millers did not demonstrate that they or intervening owners actually kept animals, other than some ducks or chickens, or that they ever used the pond or pasture in the same manner as the Morins did in the 1970s.

Moreover, the Millers' desired use is not incompatible with the SMC. The SMC prohibits landowners from "clearing or grading without first having obtained a clearing and grading permit." SMC 16.15.050. The SMC does not prevent the Millers from using their property for grazing, as Morin did, it just requires them to obtain a permit before filling and grading their property and prohibits filling and grading inside the regulated wetlands and buffers. The hearing examiner aptly concluded that "there is no compelling evidence or testimony that the filling and grading had anything to do with agricultural activities, if, in fact, real agricultural activities occurred on Parcel 9070.

The Millers failed to demonstrate a valid nonconforming use that would excuse compliance with the SMC's restriction on filling wetlands and wetland buffers.[4]

---

[3] See, e.g., Clerk's Papers at 207 (Hankins estimated that the Millers used more than 380 cubic yards of dirt to fill in wetlands).

[4] The Millers also argue that their activities were exempt under the SMC's exemption for maintenance and revision of landscaping. SMC 21A.50.060(4) allows landscape features to be revised or

C.

The Millers next argue that the penalty order which requires them to restore the destroyed wetlands on their property is unconstitutionally vague and that the penalty assessed against them was calculated in a constitutionally infirm manner. We disagree.

1.

The Millers argue that the notice was unconstitutionally vague. This is so, they contend because the notice must specifically state what constituted the violation and what must be done to comply with the order.

Penalty orders must be specific about the asserted violations, about the government's authority, and about the requirements it imposes. See Mansour v. King County, 131 Wn. App. 255, 271-72, 128 P.3d 1241 (2006). Further, orders cannot leave enforcement officials with unfettered discretion when reviewing compliance. State v. Sansone, 127 Wn. App. 630, 639, 111 P.3d 1251 (2005).

Here, the notice was specific about the asserted violations and the City's authority. The notice precisely detailed all of the actions that Hankins and the City had taken up to that point. The notice detailed how the City came to believe that the Millers had violated the SMC, what investigation materials the City relied upon, and all of the efforts the City made to address these issues before assessing a penalty. The notice then specifically cited what sections of the SMC the Millers had violated.

---

replaced with similar features, which the Millers argue includes the "revisions" they made. But the Millers ignore the next sentence of SMC 21A.50.060(4) which continues "such that remaining functions of the critical area and/or buffer are maintained or improved." There is no evidence in the record that the wetlands and wetland buffers present on the Millers property was maintained or improved. To the contrary, there was credible testimony that the Millers completely removed the wetlands and wetland buffers on their property.

The notice also specified what, precisely, the Millers were required to do to come into compliance.[5] The notice required the Millers to: (1) prepare and submit a clear and grade permit application; (2) submit a wetland delineation report and mitigation plan with the permit application; (3) hire a wetland biologist to classify any wetlands remaining on the property, evaluate and map the wetlands and wetland buffers to determine the extent of restoration needed, and prepare a restoration plan; and (4) complete a Sammamish bond quantity worksheet to determine what bond, if any, the Millers are required to post.

---

[5] The order stated:

Pursuant to Chapter 23.10.010 SMC . . . you are hereby ordered to discontinue this illegal action and to take the proper corrective actions to abate all listed violation(s) above within 60 days . . . as follows:

A.      Prepare and submit a Clear and Grade permit application as required with appropriate permit fees . . . in accordance with SMC 16.20.195 . . .

B.      A Wetland Delineation Report and Mitigation Plan is required to accompany the Clear and Grade Permit application in accordance with [SMC] section 21A.50.120. [That plan] shall be provided by a qualified wetland biologist and must propose to either move forward with the grading project, or restore the site to its previous condition as follows:

(1)      Delineate the wetland on the subject property . . .

(2)      The wetland biologist must classify the wetland and associated buffers consistent with Sammamish wetland classification requirements (SMC 21A.50.290(1)) . . .

(3)      The wetland biologist must also evaluate and map the extent wetland and buffer clearing, grading and pruning areas where located within wetland and buffer areas to determine the extent of the code violation and to define needed restoration.

(4)      The wetland biologist must prepare a restoration plan for the wetland, and buffer areas cleared in violation of wetland and buffer protections in SMC 21A.50.290. This restoration plan must be prepared consistent with SMC 21A.50.145, SMC 21A.50.310, and SMC 21A.50.350 . . .

(5)      A Sammamish bond quantity worksheet must be prepared that is consistent with the restoration plan. After the City approves the critical areas study, critical areas restoration plan and bond quantity worksheet, the property owner will need to post a performance bond.

C.      The property owner shall guarantee the remediation of the damage in accordance with the restoration plan, in a manner acceptable to the [Director].

Further, the notice did not leave enforcement officials with unfettered discretion. The notice requires the Millers to go through the normal process to obtain a clear and grade permit under the City's code. See SMC 16.15.060, 16.15.070. Therefore, SMC 16.15.070(4) expressly establishes the standards that the Director will use to evaluate the Millers' clear and grade permit application. Similarly, SMC 21A.50.130 sets forth what information must be included in the Millers' critical area study for it to be acceptable. While the notice does not precisely lay out what the actual restoration plan must say, that is so the Millers can maintain control over their own land. And the Millers' wetland biologist agreed that "restoration plan" was an industry term that he was familiar working with.

And, contrary to the Millers' contention, if the City rejects their proposed restoration plan they will have the ability to appeal that decision. The SMC provides that the City's hearing examiner has jurisdiction over "[a]ppeals of all Type 2 land use decisions[,]" SMC 20.10.070(1)(b), which is defined as discretionary decisions made by the Director. SMC 20.05.020. So the fact that the Director may reject the Millers' proposed plan does not afford the Director unfettered discretion when: (1) the Director's decision is guided by the SMC and (2) the Millers can appeal the Director's decision if they believe that it is erroneous.

The notice here is similar to this court's decision in Beatty v. Washington Fish & Wildlife Comm'n, 185 Wn. App. 426, 341 P.3d 291 (2015). Although, Beatty was an appeal of a permit decision, the court's reasoning is still persuasive here. There, the court disagreed that the Washington hydraulic mining permit statute was unconstitutionally vague because it failed to give the Department of Fish and Wildlife

guidance on when to accept or deny permits. Beatty, 185 Wn. App. at 457. The court rejected the appellant's contention that "a precise standard is needed in the environmental context[,]" instead finding the statutory phrase "protection of fish life" sufficiently definite. Beatty, 185 Wn. App. at 457-58.

Similarly here, the City was not required to provide the Millers with a precise standard for how to complete their restoration project. First, the Millers would be guided by the standard application and critical area processes delineated in the SMC. Further, the Millers' wetland expert was familiar with the industry standard and had prepared such reports before. And finally, the order allowed the Millers the freedom to control their land without excessive City oversight, as long as they met the basic requirements set forth in the order and the SMC. The notice was not unconstitutionally vague.

2.

The Millers also argue that the penalty was set in an ad hoc manner. They assert that it was unacceptable for the City to rely on an unpublished, unadopted worksheet when setting their penalty. SMC 23.100.010 establishes a fee assessment schedule for violations of the Sammamish City code. It provides that the penalty for a stop work order is up to $500 and the penalty for Environmental Damage/Critical Areas Violations is up to $25,000 plus the cost of restoration. SMC 23.100.010. Further, SMC 23.100.010 sets the daily penalty for noncompliance at $100 up to $250 per day for days 1 to 15, $250 up to $500 per day for days 16 to 31, and $500 up to $1000 per day for days 31 and above.

In determining the precise penalty to impose in this case, Hankins used the City's standard "Guidelines for Determining Environmental Damage/Critical Area Violations"

worksheet. The Millers assert that the City's use of this worksheet was constitutionally impermissible because the worksheet was unpublished. But all the worksheet does is limit the enforcement officer's discretion in setting penalties under SMC 23.100.010. The use of this worksheet actually benefitted the Millers in that the worksheet provides that for first time violators the maximum fine is $15,000 while SMC 23.100.010 has no such limitation.

The cases cited by the Millers in support of their argument are inapposite. See, e.g., Simpson Tacoma Kraft v. Dep't of Ecology, 119 Wn.2d 640, 835 P.2d 1030 (1992) (holding the Department of Ecology could not mandate compliance with unpublished standards relating to the discharge of dioxin into State waters).[6] Each of these cases involved an unpublished city policy that the regulated entity itself had to comply with. Therefore, the fact that the policies in those cases were unpublished negatively impacted the regulated party's ability to comply. Here, however, the worksheet did not have any impact on the Millers' ability to comply with the SMC and the way in which the City went about determining precisely what penalty to assess within SMC 23.100.010 had no bearing on the Millers. Therefore, simply because the worksheet was not officially published or adopted by the City Council does not undermine the penalty.

IV.

The Millers next contend that the hearing examiner's conclusions that they filled regulated wetlands were not supported by substantial evidence and were a clearly erroneous application of facts to the law. We disagree.

---

[6] See also Norco Constr. v. King County, 29 Wn. App. 179, 627 P.2d 988 (1981) (holding cities must analyze subdivision applications pursuant to adopted codes rather than unadopted policies); Anderson v. Issaquah, 70 Wn. App. 64, 851 P.2d 744 (1993) (holding building permits must be analyzed according to adopted standards).

A.

In concluding that the wetlands K and L on the Miller property were regulated wetlands, the hearing examiner considered: the 2005 sensitive area report prepared by Talasaea, the 2008 critical area study by AOA, testimony and the written report by Lund and The Watershed Company, and the review by Ecology. The totality of this evidence supports the hearing examiner's conclusion that wetlands K and L were regulated wetlands on the Millers' property. The City's expert witness Lund audited the Talasaea report and concluded with scientific probability that the Talasaea report correctly documented wetlands K and L as class III wetlands, in accordance with the scientific classification system in place at the time the report was prepared. While the Millers argue that the Talasaea report did not identify wetland hydrology—one of three primary wetland characteristics—Lund noted that the Talasaea report addressed the allegedly "missing" parameter in a manner consistent with the applicable wetland rating system and this in no way invalidated the conclusion that the wetlands existed. Ecology wetland scientist Gresham reviewed both parties' expert reports and concurred with Lund and the Talasaea report's delineation of both wetlands.

The Millers argue also that the City cannot rely on the Talasaea report because it is more than 10 years old. But the Millers cite no authority for this proposition. On cross-examination, Lund did agree that "the standard practice is that these studies are good for a five-year period." But, as Ecology's wetland specialist Gresham explained, "[a]lthough Ecology does not usually rely on wetland findings more than five years old, the Talasaea delineation is the only on-site description of wetland conditions that preceded the fill material. Therefore, we concur with the Talasaea delineation of Wetlands K and L on the Miller property." And further, the age of the report does not

-19-

diminish its findings that in 2005 there were wetlands on the Millers' property. The City was not required to prove that wetlands exist on the Millers' property today, but that wetlands existed on the Millers' property before the Millers filled them in. Therefore, simply because the Talasaea report is from 2005 does not undercut that report's findings.

While the Millers offered contradictory testimony from lay witnesses Don Miller and Ira Morin and expert witness Sewall, "contrary testimony does not warrant reversal." Families of Manito, 172 Wn. App. at 741. Further, we must review the facts and inferences in the light most favorable to the prevailing party below. Families of Manito, 172 Wn. App. at 739-40. Review for substantial evidence is deferential and "necessarily entails acceptance of the fact finder's views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences." William Dickson Co. v. Puget Sound Air Pollution Control Agency, 81 Wn. App. 403, 411, 914 P.2d 750 (1996) (quoting State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)).

The hearing examiner concluded that there is "compelling evidence that wetlands K and L were regulated wetlands before they were filled." He determined that the Talasaea and AOA reports were credible because they "were working at the behest of land developers" who had much to lose if wetlands were found on the property, thus there was no incentive to identify wetlands. The hearing examiner also found that Miller, on the other hand, had a lot to lose if his property contains two regulated wetlands. We will not disturb the hearing examiner's findings.

Substantial evidence exists to convince a fair-minded person that the hearing examiner did not err in concluding that wetlands K and L were regulated wetlands before they were filled. RCW 36.70C.130(1)(c); Lauer, 173 Wn.2d at 252-53.

B.

The Millers also contend that the hearing examiner lacked substantial evidence that they filled in the wetlands on their property in excess of 50 cubic yards of soil per year. Because the record establishes that there was in excess of 50 cubic yards of fill dirt added to the regulated wetlands, we disagree.

At the outset, it is irrelevant how much fill the Millers added in per year because even if they only dumped 49 cubic yards of soil in the wetlands, that would still be a violation of the SMC. The SMC exempts normal and routine maintenance of existing lawns and landscaping, it does not exempt serial filling in of regulated wetlands. See SMC 16.15.050(8)(a) (exempting "up to 50 cubic yards of top soil" but specifically limiting that exemption "subject to the limitations in critical areas and their buffers set out in Chapter 21A.50 SMC."). And further SMC 16.15.050(8)(a) exempts "up to 50 cubic yards of top soil" but does not say per year. The Millers add the phrase per year to the statute where it does not exist on its face.

Donald Miller admitted that he filled the entire pond area, including wetland K, and estimated the amount of fill needed at "900 square feet" of dirt. Miller also admitted that he received 20 loads of dirt in 2017 and that he used it to construct a dirt road through wetland L. While Miller attempted to assign blame to a third party (Summit) for unauthorized dumping of over 20 loads of fill on the property, Miller admitted that he requested fill from Summit. And when Summit dumped more than Miller asked for, instead of asking Summit to remove it, he used the dirt to build the roadway through

-21-

wetland L. Photographic evidence confirmed that Miller constructed the road after the City issued the stop work order.

Second, testimony along with photographic and physical evidence established that unpermitted fill dirt was placed in wetlands K and L. Officer Hankins testified that he observed "stockpiles" of fill dirt on the Millers' property on multiple occasions in 2016 and 2017, and saw evidence that fill dirt had been spread and graded throughout the property during that time period. Hankins calculated the amount of fill over the course of the two years to be 380 cubic yards. Both parties' experts confirmed that a substantial amount of fill dirt was present in the 2017 test pits dug within the areas of wetlands L and K. The City's expert Lund dug to depths of two feet and found fill dirt all the way down. Using the wetland delineations, aerial photographs, and observations from excavations, the City's witnesses testified that both critical areas were now topped by more than two feet of fill, far exceeding the City's 50 cubic yard threshold to obtain an exemption.

The hearing examiner's conclusion that the Millers deposited more than 50 cubic yards of fill into the regulated wetlands is supported by substantial evidence.

VII.

Finally, the Millers assert that it was fundamentally unfair for the City to assess a code violation against them without first providing them notice of the fact that their property contained regulated wetlands. This argument is meritless. First, the Millers provide no authority for the proposition that the City has an affirmative duty to inform landowners that their land includes wetlands. And the SMC implies just the opposite as it is the landowner who must identify wetlands on their property and inform the City of

such. See SMC 16.15.070(1)(c) (the clearing and grading permit must "identify and describe those critical areas . . . on or adjacent to the site."); SMC 21A.50.090 ("Not all of the critical areas in the City of Sammamish are fully mapped.").

And further, the record shows that the City did provide the Millers with notice that there were regulated wetlands on their property on February 12, 2016. Yet the Millers continued to fill and grade their property after receiving such notice and were adamant that wetlands were not present on their property.

We affirm.

_Mann, ACJ._

WE CONCUR:

_Dwyer, J._

_Appelwick, C.J._