[No. 30417-5-III.   Division Three.   January 10, 2013.]

FAMILIES OF MANITO ET AL., *Respondents*, v. THE CITY OF SPOKANE, *Defendant*, ST. MARK'S LUTHERAN CHURCH, *Appellant.*

*Michael F. Connelly* (of *Koegen Edwards LLP*), for appellant.
*Richard K. Eichstaedt* (of *Center for Justice*), for respondent.

¶1 KULIK, J. — St. Mark's Lutheran Church submitted a conditional use permit (CUP) application, including a proposed site plan, to the city of Spokane for a parking lot addition. Based on the Spokane Municipal Code (SMC), St. Mark's was allowed 1 parking space per 60 square feet of the "main assembly area." A city planner recommended approval of the permit and allowed St. Mark's to increase its existing parking from 87 spaces to 91 spaces. Later, the city planner increased St. Mark's total allowable parking to 101, after conceding that the choir area, sanctuary, and fellowship hall all needed to be included in calculating the main assembly area.

¶2 Families of Manito, Ann Bergeman, Todd Stecher, and Sadie Lake (collectively known as Manito) opposed the approval of the permit. A hearing was held. On the second day of the hearing, St. Mark's presented a new proposed site plan to the hearing examiner that increased the number of parking spaces based on the latest calculation from the city planner. The proposed site plan also incorporated the concerns expressed by Manito during the first day of the hearing. The hearing examiner modified the city planner's decision approving the parking addition, directing St. Mark's to construct the parking addition in accordance with the proposed site plan.

¶3 Manito appealed to superior court. The superior court reversed the hearing examiner's decision, concluding that the hearing examiner erred by including the fellowship hall in the main assembly area and by allowing St. Mark's to modify its application during the hearing and accepting the proposed plan. St. Mark's appeals the reversal. Manito cross appeals, contending that Spokane erred by allowing a city planner, as opposed to the planning director, to issue the permit.

¶4 We conclude that the hearing examiner correctly included the fellowship hall in the main assembly area and that the city planner properly approved the CUP. Therefore, we reverse the superior court and affirm the hearing examiner's decision.

## FACTS

¶5 St. Mark's desired to expand its parking area on land adjoining the church's sanctuary and existing parking lot. The land previously contained two single-family homes. St. Mark's obtained approval of a boundary line adjustment combining the sanctuary, the existing parking area, and the adjoining property into a single larger parcel. St. Mark's existing parking consisted of 87 parking spaces.

¶6 Before applying for a CUP, St. Mark's and members of Spokane's planning department discussed the number of parking spaces that St. Mark's would be allowed under the city code. Under SMC 17C.230.130, Table 17C.230-2, the maximum number of parking spaces for religious institutions is 1 space per 60 square feet of the main assembly area. The planning department considered the main assembly area to be the sanctuary and the fellowship hall. In a later discussion, St. Mark's contended that the choir area also qualified as part of the main assembly area and the allowed maximum should be 102 spaces. Over the course of the discussions, the planning department's calculation of additional allowed spaces varied from 0 to 15.

¶7 St. Mark's submitted a CUP application and site plan to the planning department. Based on previous discussions with the planning department, St. Mark's requested 93 total parking spaces. The plan decreased the number of spaces in the existing lot to 68 and added 25 spaces in the new addition.

¶8 Dave Compton, a city planner for Spokane and a member of the planning department staff, reviewed the application. St. Mark's published and mailed notice of the application. Manito opposed St. Mark's CUP application, contending that the parking addition decreased property values, created traffic and pedestrian safety issues, changed the character of the neighborhood, and increased the potential for criminal activity, and expressing other concerns. Manito

submitted over 500 pages of information to the city planner. The city planner communicated with Manito and its attorney during the approval process. The city planner agreed to meet with Manito to discuss St. Mark's application, but Manito canceled the meeting. The city planner considered the public response in making his decision.

¶9 The city planner issued a "Type II" CUP decision, recommending approval of the application with conditions. The city planner found that the main assembly area constituted the sanctuary and the fellowship hall only. Based on the calculation of these two areas, the city planner concluded that St. Mark's parking would be limited to a total of 91 spaces in the combined existing and new parking area, an increase of 4 spaces to their existing number of parking spaces.

¶10 Both Manito and St. Mark's appealed the city planner's decision to Spokane's hearing examiner. A hearing conducted by the hearing examiner lasted two days.

¶11 Both parties raised concerns regarding the areas of St. Mark's that constituted the main assembly area. St. Mark's challenged the omission of the choir area in the calculation of the main assembly area. Prior to the hearing, the city planner conceded and determined that the main assembly area included the choir area as well as the sanctuary and fellowship hall. The city planner recalculated the square footage of the main assembly area and increased the number of allowable parking spaces to 101 spaces. The net result of this decision increased St. Mark's overall parking by 14 spaces.

¶12 Similarly, Manito challenged the inclusion of the fellowship hall in the calculation of the main assembly area. A former member of St. Mark's testified at the hearing that the fellowship hall and the sanctuary were not used at the same time. By contrast, St. Mark's presented testimony from its pastor stating that the two areas were used at the same time on certain occasions. He testified that the youth choir uses the fellowship hall during Sunday services and

that the fellowship hall is used as spillover for the sanctuary during events attracting a large number of attendees.

¶13 The hearing examiner noted that the issue of what constituted the main assembly area presented a close question. The examiner recognized the presumption in favor of the planning staff's interpretation and considered the testimony given that the two spaces are used simultaneously. The examiner was convinced that the main assembly area should include the sanctuary, the fellowship hall, and the choir area.

¶14 Manito's other main concern at the hearing was that the city planner's decision did not place appropriate conditions on the parking addition to minimize adverse impacts. Manito argued that more mitigation could have been required such as additional landscaping, screening, control of lighting and access, and possibly a gate to limit traffic.

¶15 On the second day of the hearing, St. Mark's proposed a new site plan for the addition and addressed Manito's mitigation concerns. The new plan incorporated the additional parking spaces based on the city planner's concession as well as other modifications. The hearing examiner found that the new plan showed some additional parking but reconfigured the layout in such a way as to minimize impacts on the surrounding properties to the greatest extent possible. He explained how the new plan screened the addition, calmed traffic, and minimized the parking along the neighboring property most affected by the addition.

¶16 Ultimately, the hearing examiner decided "to modify the decision of the Planning Department approving the expansion of the parking lot . . . . The modification is that the parking lot is [to] be developed substantially in accordance with the plans submitted by the Church." Administrative Record (AR) at 32. The examiner also required St. Mark's to minimize lighting conditions on the site. The

examiner left in effect all other conditions imposed by the city planner.

¶17 Manito appealed the decision of the hearing examiner to superior court. The superior court reversed, in part, the decision of the examiner. The superior court determined that the "Hearing Examiner engaged in unlawful procedure and/or failed to follow a prescribed process that was not harmless by modifying the decision being appealed during the pendency of the hearing," and that "the Hearing Examiner's decision that the Fellowship Hall . . . constituted part of the Church's main assembly area as provided for in . . . the Spokane Municipal Code was not supported by substantial evidence and was a clearly erroneous application of the law to the facts." Clerk's Papers at 159. The superior court also found that Manito failed to meet its burden on all other matters and allegations. Of particular importance, the superior court denied Manito's contention that Spokane's decision on the Type II CUP permit required a quasi-judicial process.

¶18 St. Mark's appeals the superior court's reversal of the hearing examiner's decision. Manito cross appeals.

## ANALYSIS

¶19 *Standard of Review.* When reviewing a superior court's decision under the Land Use Petition Act (LUPA), chapter 36.70C RCW, the Court of Appeals stands in the shoes of the superior court, reviewing the ruling below on the administrative record. *City of Federal Way v. Town & Country Real Estate, LLC*, 161 Wn. App. 17, 36, 252 P.3d 382 (2011).

¶20 "On appeal, the party who filed the LUPA petition bears the burden of establishing one of the errors set forth in RCW 36.70C.130(1), even if that party prevailed on its LUPA claim at the superior court." *Quality Rock Prods., Inc. v. Thurston County*, 139 Wn. App. 125, 134, 159 P.3d 1 (2007). Because Manito filed the LUPA petition, it

bears the burden of establishing the ground that provides relief from the hearing examiner's decision.

¶21 Under LUPA, RCW 36.70C.130(1)(a)-(f) provides six different grounds for a petitioner to challenge the local land use decision. This court may grant relief from a land use decision if the party seeking relief establishes any one of the following standards:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1); *Town & Country Real Estate*, 161 Wn. App. at 36-37.

¶22 RCW 36.70C.130(1)(a), (b), (e), and (f) address questions of law and receive de novo review. *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). RCW 36.70C.130(1)(c) concerns a factual determination and is reviewed for substantial evidence. *Id.* RCW 36.70C.130(1)(d) is reviewed under the clearly erroneous standard. *Id.*

¶23 *Hearing Examiner's Modification of the City Planner's Decision.* Under RCW 36.70C.130(1)(a), Manito argues that the hearing examiner engaged in an unlawful procedure or failed to follow a prescribed process by adopting St. Mark's proposed site plan as a modification to the decision of the city planner. Manito contends that the

hearing examiner should have considered St. Mark's proposed site plan as a new application because the plan made substantial modifications to the application.

¶24 SMC 17G.050.320(B) states that "[t]he hearing examiner may affirm, modify, remand or reverse the decision being appealed. In considering the appeal the examiner must act in a manner that is consistent with the criteria for the appropriate category of action being appealed."

¶25 On the other hand, SMC 17G.060.230(A) states that proposed modifications to an application, which the department has previously found to be complete, will be treated as follows:

> 2. If the applicant proposes substantial modifications to an application, as determined by the department, the application may be considered a new application. The new application shall conform to the requirements of all statutes and ordinances in effect at the time the new application is submitted. A substantial modification may include but is not limited to the following:
>
>   a. Change in use.
>   b. Increase in density.
>   c. Increase in site area; or
>   d. Changes that increase or significantly modify the traffic pattern for the proposed development.

¶26 "Change of use," for purposes of modification of a preliminary plat, means "a change in the proposed use of lots (e.g., residential to commercial)." SMC 17A.020.030(H).

¶27 "Density" is "[t]he number of housing units per acre as permitted by the zoning code." SMC 17A.020.040(H). A "site" is "[a]ny parcel of land recognized by the Spokane County assessor's office for taxing purposes. A parcel may contain multiple lots." SMC 17A.020.190(AT).

¶28 Contrary to Manito's argument, St. Mark's proposed site plan did not constitute a new application under SMC 17G.060.230. The plan submitted at the hearing did not

propose substantial modifications. First, the plan did not change the use of the property or site area. St. Mark's still sought to expand its parking lot onto two formerly residential lots. Also, the plan did not substantially change the density or the traffic patterns. The reconfigured location of the drainage swale, parking, entrance, and landscaping did not represent substantial changes to the density or traffic pattern. The changes were minor modifications to meet the concerns expressed by Manito.

¶29 Admittedly, the new plan increased the number of parking spaces. However, this is not a change in the application or a substantial modification in density. The city planner testified at the hearing that he understood St. Mark's application to be one for the maximum number of spaces that would be allowed under the SMC. The city planner conceded that 101 spaces would be allowed under the SMC. The plan exhibited the maximum allowable spaces based on the recalculation. The increased number did not change the application.

¶30 The plan introduced at the hearing was not a proposal by St. Mark's to modify its application. Instead, the plan introduced by St. Mark's provided the hearing examiner with a solution to address Manito's concern that the city planner's decision did not adequately mitigate the adverse impact of the parking addition. For instance, the modified plan reconfigured the layout of the addition to make cut-through traffic more difficult. The plan added more landscaping and fences for screening. Also, the plan showed only three parking spaces facing the house most impacted by the addition, whereas the previous site map showed nine spaces along the boundary. The hearing examiner found that the "new plan showed the addition of some parking in this lot, but reconfigured the parking lot in such a way as to minimize impacts on the surrounding properties to the greatest extent possible." AR at 31.

¶31 Using his authority under SMC 17G.050.320 to modify the decision being appealed, the hearing examiner

modified the decision of the city planner to address the increase in allowed parking spaces and to address the additional mitigation measures requested by Manito. Thus, because the hearing examiner acted in accordance with SMC 17G.050.320, he did not engage in unlawful procedure by requiring the parking addition to be built substantially in accordance with the plans submitted by St. Mark's.

¶32 *Inclusion of the Fellowship Hall in the Main Assembly Area.* Manito challenges the number of parking spaces allowed to St. Marks under SMC 17C.230.130, table 17C.230-2. Table 17C.230-2 sets out the minimum and maximum parking spaces allowed according to use category. Religious institutions are allowed a maximum of one parking space "per 60 sq. ft. of main assembly area." SMC 17C.230.130, tbl. 17C.230-2.

¶33 Manito contends that the hearing examiner erred by including St. Mark's fellowship hall as part of the main assembly area when calculating the number of spaces. To make this challenge, Manito maintains that the hearing examiner's decision to include the fellowship hall was not supported by substantial evidence under RCW 36.70C-.130(1)(c) and that the decision was a clearly erroneous application of the law under RCW 36.70C.130(1)(d). On the other hand, St. Mark's maintains that the hearing examiner is given substantial deference in interpreting the provisions of the city code and his decision was based upon the record.

■ ■ ¶34 Manito's challenge under RCW 36.70C-.130(1)(c) requires a factual determination as to whether the land use decision is supported by substantial evidence, meaning facts show that the fellowship hall is used with the sanctuary as part of the main assembly area. "Substantial evidence is evidence that would persuade a fair-minded person of the truth of the statement asserted." *Cingular Wireless*, 131 Wn. App. at 768. Facts and inferences from the evidence are to be viewed in the light most favorable to the party that prevailed in the highest forum exercising fact-

finding authority. *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 831, 256 P.3d 1150 (2011).

¶35 Manito's challenge under RCW 36.70C.130(1)(d) requires a clearly erroneous standard as to whether the facts support the legal conclusion regarding the main assembly area. Application of the clearly erroneous standard allows the court to reverse a land use decision when the court is left with a definite and firm conviction that the examiner's decision is incorrect, even though there is evidence to support the decision. *Phoenix Dev.*, 171 Wn.2d at 829. In applying the clearly erroneous standard, we defer to the factual determinations made by the highest forum that exercised fact-finding authority. *Cingular Wireless*, 131 Wn. App. at 768.

¶36 "When construing an ordinance, a 'reviewing court gives considerable deference to the construction of the challenged ordinance by those officials charged with its enforcement.' " *Phoenix Dev.*, 171 Wn.2d at 830 (internal quotations omitted) (quoting *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 42, 156 P.3d 185 (2007)). "The primary foundation and rationale for this rule is that considerable judicial deference should be accorded to the special expertise of administrative agencies." *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975).

¶37 Moreover, SMC 17G.050.320(C) states that "[t]he original decision being appealed is presumptively correct. The burden of persuasion is upon the appellant to show that the original decision was in error and the relief sought in the appeal should be granted."

¶38 First, the term "main assembly area" was not defined in the SMC. Therefore, in interpreting the term "main assembly area" as found in the SMC, we give deference to the local jurisdiction with expertise. Here, deference is due to Spokane's hearing examiner and city planner to interpret Spokane's code. At the appeal hearing, the city planner testified that he understood that people gather in the

fellowship hall, meeting the definition of "main assembly area." The hearing examiner agreed with the city planner that the term "main assembly area" incorporated the fellowship hall. The hearing examiner's legal conclusion that the fellowship hall falls within the main assembly area is presumptively correct.

¶39 Next, substantial evidence supports the hearing examiner's finding that the fellowship hall should be included in the main assembly area. St. Mark's pastor testified about the concurrent use of the fellowship hall and the sanctuary as a gathering place. Every Sunday, the youth choir meets in the fellowship hall during worship services. On days with very high attendance, people gather in the fellowship hall to worship using television monitors. The fellowship hall and the sanctuary are built with folding doors and double doors to make room for events such as large funerals.

¶40 Even though a former member of St. Mark's presented contrary testimony, the contrary testimony does not warrant reversal. The court must accept the hearing examiner's assessment of weight and credibility. *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 99 Wn. App. 127, 133-34, 990 P.2d 429 (1999), *aff'd*, 146 Wn.2d 740, 49 P.3d 867 (2002). Furthermore, we view the facts and inferences in a light most favorable to St. Mark's as the prevailing party in the hearing examiner's decision. Substantial evidence exists to convince a fair-minded person that both spaces are utilized as the main assembly area. And the hearing examiner's finding supports the legal conclusion determining what constitutes the main assembly area.

¶41 Last, the hearing examiner's conclusion to include the fellowship hall as part of the main assembly area is not a clearly erroneous application of the law to the facts. According to the SMC, the number of parking spaces allotted to St. Mark's was based on the square footage of the main assembly area. The hearing examiner heard evidence and, using his expertise, determined that the main assem-

bly area consisted of the sanctuary, fellowship hall, and choir area. The hearing examiner approved the number of parking spaces based on his interpretation of the main assembly area. This is not an erroneous application of the law to the facts. There is no definite, firm conviction an error occurred based on the hearing examiner's decision to include the fellowship hall as part of the main assembly area.

¶42 The superior court erred by reversing the decision of the hearing examiner. The hearing examiner's decision that the fellowship hall was part of the main assembly area was supported by substantial evidence and was not a clearly erroneous application of the law to the facts.

¶43 *City Planner's Approval of the Parking Addition.* Manito contends that Spokane failed to lawfully follow procedure and erroneously interpreted SMC 17A.020.200 by allowing a staff member to approve St. Mark's Type II CUP application.[1] To support its contention, Manito assigns error to the hearing examiner's finding that it was proper for the city planner, rather than the planning director, to make the Type II decision in contradiction of the clear language of the SMC. Flowing from this assignment of error is Manito's contention that the finding meant that the hearing examiner ignored the quasi-judicial requirement and that the planning department was not required to adhere to the appearance of fairness doctrine as part of its quasi-judicial decision.

¶44 SMC 17A.020.200(O) defines a "Type II Application" as "[a]n application for a project permit that is subject to a quasi-judicial decision of a department director ... but does not require a public hearing."

¶45 SMC 17A.020.170(E) defines a "quasi-judicial decision" as "[a] permit decision by an officer authorized by the

---

[1] Manito raised these issues in its closing arguments before the hearing examiner and again in its complaint to the superior court. Manito may raise these issues on appeal.

local government in which judicial-like power is vested. The decision may be approval, denial, or approval with conditions and is subject to the applicable development standards of the land use codes or development codes."

¶46 The appearance of fairness doctrine applies to quasi-judicial proceedings, which are adjudicatory in nature and require a public hearing. *Raynes v. City of Leavenworth*, 118 Wn.2d 237, 245, 821 P.2d 1204 (1992). The doctrine requires that these proceedings are procedurally fair and conducted by impartial decision makers. *Id.* Generally, the doctrine prohibits ex parte communications in quasi-judicial proceedings. RCW 42.36.060.

¶47 As a preliminary note, the hearing examiner did not make a finding that it was proper for the city planner to make such a decision. However, to best address this argument, we construe the hearing examiner's decision to imply such a finding. It is also important to note that the decision under review is that of the hearing examiner, not the planning department. We review "the decision of the local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals." *Lakeside Indus. v. Thurston County*, 119 Wn. App. 886, 894, 83 P.3d 433 (2004). Therefore, Manito has the burden of proving that the hearing examiner failed to lawfully follow procedure or process, or erroneously interpreted the SMC.

¶48 First, the hearing examiner did not fail to follow proper procedure or process or erroneously interpret the law by upholding the decision of a city planner rather than the planning director. The planning director had the power under SMC 17A.010.070 to delegate his or her authority and for his or her designee to administer the land use application. Additionally, SMC 01.02.130 states that every function, authority, and responsibility vested by the SMC to a particular office can be delegated to city personnel—an act performed without authority may be ratified. At the administrative hearing, the city planner testified that he

was designated to review St. Mark's land use application process. There is no requirement that this delegation be in writing. The hearing examiner did not err by reviewing or upholding the decision of the city planner.

¶49 Second, the hearing examiner did not fail to follow proper procedure or erroneously interpret the law by upholding the city planner's decision because the appeal process before the hearing examiner cured any procedural or interpretation issues that may have occurred at the city level. Manito was provided a quasi-judicial process on appeal. It fully participated in the hearing, which was conducted by a fair and neutral decision maker. Based on concerns presented by Manito during the hearing, the hearing examiner modified the approval of the planning department. The hearing examiner's decision to modify the application under SMC 17G.050.320 became the final decision and the decision under review here.

¶50 Third, the hearing examiner's implied finding that the city planner could make the decision did not automatically result in an erroneous interpretation of the quasi-judicial requirements of SMC 17A.020.200. The hearing examiner did not ignore the quasi-judicial provision of the SMC or allow the city to violate the appearance of fairness doctrine. In his written findings, the hearing examiner determined that the "Administrative [CUP] is a Type II permit which can be issued administratively by the Planning Department." AR at 28. Manito does not assign error to the finding that the issuance of the permit is an administrative function.

¶51 The hearing examiner's finding that the process was administrative contradicts Manito's argument that the quasi-judicial decision needed to follow the appearance of fairness doctrine. For local land use decisions, the application of the appearance of fairness doctrine is limited to quasi-judicial actions of local decision making bodies that determine the legal rights, duties, or privileges of specific parties in a *hearing or contested case proceeding*. RCW

42.36.010. Particularly applicable to this situation, the appearance of fairness doctrine "has never been applied to administrative action, except where a public hearing was required by statute. The appearance of fairness requirements which have been developed for hearings are inappropriate in the building permit application process which necessarily involves frequent informal contacts between the applicant and employees of the building department." *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 67-68, 578 P.2d 1309 (1978) (citation omitted).

¶52 In the SMC, according to Table 17G.060-3, a hearing is not required for the issuance of a Type II CUP. SMC 17G.060.120.

¶53 Here, because a hearing is not required in Spokane's Type II CUP application process, the appearance of fairness doctrine does not apply. Furthermore, as stated in *Polygon*, the appearance of fairness doctrine is impractical in the realm of a permit application process.

¶54 While the appearance of fairness doctrine was not applicable to the city planner's decision making process, judicial-like qualities were still needed in the process. The standard with which we test such allegations of partiality must be "whether the allegations, if found to be true, demonstrate actual partiality precluding fair consideration of an application." *Polygon*, 90 Wn.2d at 68.

¶55 The record shows that the city planner received and reviewed information from both parties. The city planner accepted over 500 pages of information from Manito. The city planner communicated with Manito and its attorney during the approval process. Also, the city planner agreed to meet with Manito, even though a meeting was not required under the Type II CUP application process. While St. Mark's had numerous contacts with the city planner and the planning department on a more frequent basis, such contact was expected in the application process. The city planner considered the issues raised by Manito in his decision, as well as comments from St. Mark's. The record

shows an impartial decision making process by the city planner.

¶56 To summarize, the hearing examiner did not ignore the quasi-judicial requirement of a Type II CUP application. The hearing examiner interpreted the SMC and determined that the approval of Type II permits was administrative. The planning department's decision did not need to comply with the appearance of fairness doctrine. Even so, the record shows that the city planner acted as a fair and impartial decision maker within the bounds of a quasi-judicial, administrative decision.

¶57 *New Arguments.* Manito's reply brief suggests new arguments. Pursuant to RAP 10.3(c), we decline to address these issues. Even so, the substance of these new arguments have been adequately addressed through Manito's main contentions.

## CONCLUSION

¶58 The hearing examiner did not fail to follow lawful procedure or process or erroneously interpret the law by concluding that the main assembly area included the fellowship hall and that it was proper for the city planner to issue the Type II CUP. Furthermore, the hearing examiner's determination that the process was administrative did not ignore the quasi-judicial requirement under the SMC.

¶59 We reinstate and affirm the decision of the hearing examiner.

SWEENEY and BROWN, JJ., concur.

Reconsideration denied February 14, 2013.

Review denied at 177 Wn.2d 1025 (2013).