# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ABBEY ROAD HOMEOWNERS ASSOCIATION; NEIL BARNETT; MANAJI SUZUKI; JOHN STILIN; and SHERRY STILIN,<br><br>    Respondents,<br><br>  v.<br><br>CITY OF REDMOND; EASTSIDE RETIREMENT ASSOCIATION; and EMERALD HEIGHTS,<br><br>    Appellants. | No. 80999-7-I<br>(consolidated with No. 81070-7-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — The City approved permits necessary for construction of a large assisted living residence on Emerald Heights's retirement campus. The property is zoned R-6. The building would occupy what is presently a greenbelt abutting 176th Avenue NE in Redmond. The City determined that the construction would not have significant environmental impacts, and issued a determination of DNS under SEPA. The HOA of Abbey Road, a community of single-family residences on the other side of 176th Avenue NE, filed a LUPA appeal of the hearing examiner's determinations to the superior court. The superior court overturned the City's issuance of a DNS, but reserved ruling on the permit issues. Emerald Heights appeals. We reverse.

FACTS

Emerald Heights is a retirement community in the Education Hill neighborhood of the city of Redmond (City). Abbey Road is a community of large single-family residences. The two were developed by the same developer in the 1990s and sit on opposite sides of 176th Avenue Northeast (NE).

Emerald Heights consists of a large number of independent living units, memory care units, assisted living units, and skilled nursing units. The larger main buildings are in the center of the campus. The eastern edge of the property (bordering 176th Avenue NE) is currently a roughly 80 foot deep greenbelt that largely blocks views of the campus buildings.

Abbey Road consists of large single-family homes with yards, mature landscaping, traditional gabled roofs, and consistent exterior materials including lap board siding. The subdivision has a homeowners association (HOA) and covenants, conditions, and restrictions that impose aesthetic controls within the division. The size of homes in Abbey Road are limited to two and one half stories. There is also a minimum roof-slope requirement, as well as a minimum square footage requirement for new homes.

At the time Emerald Heights and Abbey Road were developed, the area was zoned R-4, which imposed a 30 foot height limit on buildings. In order to develop the Emerald Heights campus, the original developers secured a planned unit development (PUD) and special development permit (SPD) in 1988. The PUD and SPD allowed Emerald Heights to exceed the 30 foot maximum, subject to

2

some conditions. The original PUD and SPD restricted development of large buildings to the central portion of the campus. It also required the retirement center be as far as possible from the neighboring single-family residences.

In 2010, Emerald Heights applied for a development guide amendment to rezone its property from R-4 to R-6 in order to allow additional development on the campus. The Redmond City Council approved the rezone in 2011. The rezone supplanted the PUD conditions.

In 2016, Emerald Heights began the preapplication process for further development on the campus. The proposal at issue here calls for construction of three new buildings: a 44,149 square foot assisted living facility on the eastern side of the campus along 176th Avenue NE and two independent living facilities totaling 70,638 square feet along the southern portion of the campus. The assisted living facility would be about 300 feet long and 37 to 45 feet tall, or about 3 stories in most places. The side of the building that faces 176th Avenue NE will have windows covering the façade. It will be screened by a combination of existing trees and new plantings and landscaping.

Emerald Heights and the City originally proceeded under a "Site Plan Entitlement" (SPE) process. Beginning in August 2016, Emerald Heights worked with the City's Design Review Board (DRB) regarding the project, incorporating its feedback as the proposal developed.

On May 10, 2017, the City sent a letter to nearby residents informing them of the project and inviting them to comment on the proposal. Local residents

3

expressed considerable interest in the proposal, prompting the City to arrange a meeting between Emerald Heights and the Abbey Road HOA. On June 9, 2017, Emerald Heights hosted a meeting with the HOA to discuss the project and its concerns.

On April 23, 2018, the HOA's attorney sent a letter to the City raising concerns that the SPE process was not sufficient for the proposal. It asserted that a conditional use permit (CUP) was also required. Emerald Heights then applied for a CUP for the project with the City.

After Emerald Heights filed the CUP application, Emerald Heights continued to meet with the DRB and incorporate further changes to the project. The DRB eventually voted to approve the project on September 6, 2018. Through the DRB review process, Emerald Heights agreed to numerous changes to the proposal, including (1) shifting much of the building back an additional eight feet from the property line, (2) shifting back the top two floors on the rest of the building an additional five feet, (3) retaining additional mature trees and removing a walking trail between the building and the street to accommodate more trees, (4) adding trees and increasing their initial size at planting to provide additional screening, (5) removing units from the most visible corner of the building, (6) incorporating residential features like darker colored siding materials, roof parapets, eave overhangs, window bays, and sloped roofs.

Emerald Heights also submitted an environmental impact checklist under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. Emerald

4

Heights submitted its SEPA application to the City's Technical Committee—the City's SEPA Responsible Official—on June 14, 2018. The technical committee issued a determination of nonsignificance (DNS), followed by a public comment period which ran through August 9, 2018. The HOA appealed the DNS to the Redmond City Hearing Examiner on August 22, 2018.

The technical committee also reviewed the SPE and CUP applications in order to provide recommendations to the hearing examiner on those issues. The technical committee recommended that the hearing examiner approve both permits with conditions.

The hearing examiner conducted a consolidated hearing on all three issues—the SPE, CUP, and DNS—on January 7, 14, and 28. The hearings included argument by counsel and public comment proceedings. The primary issues considered by the hearing examiner included the aesthetic impacts of developing the greenbelt buffer, loss of privacy and views for residents closest to the development, lighting impacts, loss of vegetation and trees, traffic congestion, construction impacts, postconstruction noise from social events, odors from the facilities kitchen, whether the development was incompatible with the surrounding neighborhood, future impacts, and adverse impacts on emergency services.

The hearing examiner granted the CUP and SPE subject to conditions and denied the SEPA appeal. The HOA then filed a land use petition appealing that determination to the King County Superior Court. The superior court determined that the hearing examiner had erred in affirming the DNS. Specifically, it found

that the hearing examiner erred when it determined that the development "[would] not have significant adverse aesthetic, views, privacy, lighting, trees (screening) and land use impacts . . . under SEPA." It did not rule on the SPE or CUP issues.

Emerald Heights and the City appealed. The HOA and certain individual residents of Abbey Road (collectively, HOA) cross appealed.

DISCUSSION

Emerald Heights and the City argue the superior court erred in overturning the hearing examiner's affirmance of the DNS. They also argue the superior court erred in failing to rule on the hearing examiner's decisions on the SPE and CUP. They argue these decisions of the hearing examiner should be affirmed. The HOA assigns no error to the superior court's ruling.[1]

The Land Use Petition Act (LUPA), chapter 36.70C RCW, governs judicial review of land use decisions by local jurisdictions. In a LUPA action, we stand in the shoes of the superior court and review the hearing examiner's action on the basis of the administrative record. Cingular Wireless, LLC v. Thurston County, 131 Wn. App. 756, 767, 129 P.3d 300 (2006).

When reviewing a local decision maker's application of law to the facts, the "clearly erroneous" standard applies. RCW 36.70C.130(1)(d); Cingular Wireless, 131 Wn. App. at 768. A decision is clearly erroneous when the reviewing court is

---

[1] In its brief, the HOA asked us not to consider whether the hearing examiner was correct in affirming the CUP and SPE if we reverse the superior court's ruling on the DNS. It abandoned that position at oral argument, and encouraged us to overturn the hearing examiner's decision on those issues if we reverse the superior court's ruling on the DNS.

left with a definite and firm conviction that a mistake has been made even if some evidence supports the hearing examiner's decision. Norway Hill Pres. & Prot. Ass'n v. King County Council, 87 Wn.2d 267, 274, 552 P.2d 674 (1976). But, a reviewing court should not substitute its judgment for that of the administrative decision maker. Polygon Corp. v. City of Seattle, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978).

The party seeking relief from a land use decision bears the burden of establishing that the decision-maker's application of the law to the facts was clearly erroneous. Cingular Wireless, 131 Wn. App. at 767-68. Here, that is the HOA.

The hearing examiner's decision must be supported by substantial evidence. RCW 36.70C.130(1)(c). Substantial evidence is evidence that would persuade a fair-minded person of the truth of the statement asserted. Cingular Wireless, 131 Wn. App. at 768. Our deferential review requires that all evidence and reasonable inferences be considered in the light most favorable to the party who prevailed at the highest forum that exercised fact-finding authority. Id. Here, that is Emerald Heights.

I. Determination of Nonsignificance

The appellants argue that the superior court erred in overturning the hearing examiner's affirmance of the DNS. The DNS was issued pursuant to SEPA.

SEPA requires a threshold determination on whether any governmental action will have significant environmental impacts. RCW 43.21C.030; WAC 197-11-310(1). This determination must be documented in either a determination of

significance (DS) or a DNS. WAC 197-11-310(5). A DNS is appropriate where the SEPA responsible official determines there will be no probable significant adverse environmental impacts from a proposal. WAC 197-11-340(1). "Significant" in this context means a reasonable likelihood of a more than moderate adverse impact on environmental quality. WAC 197-11-794(1). Significance involves context and intensity and does not lend itself to a formula or quantifiable test. WAC 197-11-794. Consideration of this and other relevant factors is generally achieved by utilizing the environmental checklist found in WAC 197-11-960. WAC 197-11-315. That checklist contains a section addressing aesthetic concerns. WAC 197-11-960(B)(10).

In applying the clearly erroneous standard to the issuance of a DNS, it is appropriate to consider the broad public policy of consideration of the environmental amenities and values in decision-making by government bodies. Norway Hill, 87 Wn.2d at 272. However, SEPA "does not demand any particular substantive result in governmental decision making." Id. (quoting Stempel v. Dep't of Water Res., 82 Wn.2d 109, 118, 508, P.2d 166 (1973). SEPA requires consideration of environmental factors along with economic and technical considerations. Id.

The HOA's primary argument against the DNS on appeal is that the hearing examiner did not appropriately consider the aesthetic impacts of the building. Among the aesthetic considerations it puts forward are views, privacy, lighting, and screening from trees. Aesthetic considerations—scale, light, traffic, density, and

8

open space—can be a significant environmental impact, and local decision makers have declined to issue a DNS on that basis. See Victoria Tower P'ship v. City of Seattle, 59 Wn. App. 592, 601-02, 800 P.2d 380 (1990).

A. Location on the Campus

The HOA identifies the location of the proposal as a "foundational cause" of the adverse aesthetic impacts of the proposal. It claims the building would not have significant adverse impacts if it was placed in a different location on the Emerald Heights campus. It argues that, by placing the building so close to 176th Avenue NE, the aesthetics of removing many existing trees and replacing them with a large building would be significant.

The hearing examiner considered this argument. She found that many other portions of the campus were unbuildable due to steep slopes and a stream buffer. The HOA assigned error to this finding, but provided no argument in support of the assignment. We accept the hearing examiner's finding that certain other areas of the campus are unbuildable.

The HOA is correct that the original PUD restricted large buildings to the center of the campus. But, both the hearing examiner and the superior court agreed that the 2011 rezone of the Emerald Heights campus replaced the original 1988 PUD for the campus.[2] The HOA has withdrawn its cross appeal of those determinations.

---

[2] The HOA nevertheless points to statements from the city council members who approved the 2011 rezone indicating they would not have done so if they had known that large construction would be permitted so close to the perimeter of the

9

B. Height, Bulk, and Scale

The HOA also contends that the size and scope of the project is simply incongruous with the rest of the neighborhood. The hearing examiner considered this argument. It considered that the height of the building complies with applicable codes. The HOA characterizes this review as being merely "if the project meets the City of Redmond Code requirements, it will not have significant adverse impacts." But, the hearing examiner's reasoning was not so simple. While it considered that the height was within code limits, it also considered the degree to which the view of the building would be obstructed by vegetation.[3] And, it considered that the neighborhood contains other large buildings, including a high school and a church.

C. Lighting and Privacy

The HOA also argues that significant adverse effects will result from the internal lights in the proposed building in the evening. It argues that the building

---

campus. But, legislative intent cannot be shown by statements of individual legislators. See Woodson v. State, 95 Wn.2d 257, 264, 623 P.2d 683 (1980).

[3] The HOA disputes the level to which the vegetation will actually obstruct the views of the building. It points to the fact that some of the trees are deciduous and will lose their leaves in the winter. It also argues that the evergreen trees that will be planted as part of the project will not be tall enough at the time of planting to provide full screening. It introduced statements from an arborist that the newly planted vegetation would not provide sufficient screening. But, Emerald Heights introduced statements from their landscape architect and another arborist detailing why the screening would be sufficient. The hearing examiner considered the competing testimony in detail, and found that the proposed landscaping buffer would provide sufficient screening. We must accept the hearing examiner's assessment of weight and credibility. Families of Manito v. City of Spokane, 172 Wn. App. 727, 741, 291 P.3d 930 (2013). And, the facts and inferences must be viewed in the light most favorable to Emerald Heights. Id. Contrary testimony does not warrant reversal. Id.

would have 70 or more large windows facing the neighborhood. Because the building would be operational "24 hours a day and 7 days a week," the HOA argues that the light from these windows will affect residents and passersby. But, the windows that face 176th Ave NE are a mix of administrative and residential units. Nothing in the record suggests that all the occupants of residential units will be up all night, or that residents who are awake will not use blinds or curtains to filter light. Some nonresidential areas will also have occupancy sensors to automatically turn the lights off when the room is unoccupied.

In support of its argument, the HOA offered the testimony of a lay witness who prepared a computer-generated design of what he anticipated the lights would look like in the evening. The hearing examiner considered this testimony. The hearing examiner specifically concluded that it was not persuaded that the prepared exhibits were accurate. We must accept that assessment. See Families of Manito v. City of Spokane, 172 Wn. App. 727, 741, 291 P.3d 930 (2013) (reviewing court must accept hearing examiner's assessments of weight and credibility). The hearing examiner also considered that the building would have no exterior light fixtures. And, whatever light that was generated from the interior would be filtered through the vegetated buffer included in the proposal, as well as vegetation on the Abbey Road side of the street. The hearing examiner found that the light impacts would not be significant.

D. Precedent for Future Development

The HOA argues that if this project is approved, it will set a precedent for future development on the campus. It is correct that whether a proposal may serve as a precedent for future development is a valid concern in the issuance of a DNS. WAC 197-11-330(3)(e)(iv). But, it is unclear whether additional development could take place on the campus. Detention ponds impede development to the north, and unbuildable slopes impede development to the west. Emerald Heights sought an R-6 rezone in order to facilitate future development.

The hearing examiner appropriately considered the potential adverse environmental impacts and evidence for and against the issuance of a DNS. But, "on the evidence submitted" she was "not persuaded that being able to see multifamily residential buildings through a vegetated buffer constitutes significant aesthetic impact . . . [c]onsidering the record as a whole." The HOA disagrees with this finding. But, a difference of opinion does not make the hearing examiner's decision wrong. The HOA bears the burden of proving that the hearing examiner's decision was clear error. See Cingular Wireless, 131 Wn. App. at 767. It does not meet that burden here.

We reverse the superior court and affirm the hearing examiner's decision on the City's decision to issue a DNS on the project.

II. SPE and CUP

Emerald Heights asks this court to affirm the hearing examiner's approval of the CUP and SPE. The HOA argues we should find the hearing examiner erred.

Redmond Zoning Code (RZC) art. VI, § 21.76.070 provides criteria that apply to all land use permits. It imposes a requirement of consistency between the proposed project and applicable regulations and the City's Comprehensive Plan (RCP). Id. Additional requirements for a retirement residence are outlined in RZC art. I, § 21.08.370(C)(3)(b).

The HOA makes five primary arguments against the hearing examiner's determination. First, the hearing examiner improperly disregarded community opposition to the project. Second, the proposal is inconsistent with the RCP. Third, the proposal is not compatible with the area. Fourth, the proposal is inconsistent with the City's design standards. Last, the proposal does not meet specific requirements for retirement communities.

We review the hearing examiner's application of law to the facts in this context under the clearly erroneous standard. RCW 36.70C.130(1)(d); Cingular Wireless, 131 Wn. App. at 768. When reviewing a permitting decision such as a CUP, we recognize the broad discretion afforded to local decision makers in determining whether to grant a particular application. Timberlake Christian Fellowship v. King County, 114 Wn. App. 174, 181, 61 P.3d 332 (2002).

A. Community Opposition

First the HOA argues the hearing examiner improperly disregarded community opposition to the project. It argues that the hearing examiner dismissed

public testimony as mere "community opposition" that "deserved no weight in informing her decision." It cites to the following finding of the hearing examiner:

> Project opponents have made their strong feelings clearly understood, they want to continue to see the mature trees along 176th Avenue NE and, equally importantly, to continue not to see multistory retirement residence buildings from the same vantage[.] These types of opinions are not uncommon and are not surprising, no one enjoys losing a favorite view on neighboring property or on a road they frequently travel[.] Project opponents invested a great deal of time and energy to study zoning code requirements and the Comprehensive Plan, and to develop and fill the record with their own interpretations of whether the project complies with required development standards[.] However, as stated at the hearing, land use permits are not decided by popularity contest or by vote[.] While reasonable minds can differ on interpretations of code requirements, based on the record submitted, the undersigned is not persuaded by the code interpretations of project opponents [.] As detailed in the previous conclusions, the evidence as a whole shows compliance with all applicable standards[.] Washington courts have held that community displeasure alone cannot serve as the basis for denial of a permit[.] "While the opposition of the community may be given substantial weight, it cannot alone justify a local land use decision[.]" Based on the record submitted, the permits must be granted.

(Citations omitted) (quoting Sunderland Family Treatment Servs. v. City of Pasco, 127 Wn.2d 782, 797, 903 P.2d 986 (1995)).

The hearing examiner did not disregard the community opposition or dismiss it as irrelevant. To the contrary, the hearing examiner recognized the considerable effort that community members put into putting forth their own reasonable interpretation of the code's requirements. But, the hearing examiner was not persuaded by those interpretations. The hearing examiner did not dismiss the community opposition as "deserv[ing] no weight in informing her decision." Citing Sunderland, she concluded, consistent with case law, that such opposition can be given substantial weight, but cannot alone justify a local land use decision.

14

We must defer to the hearing examiner's assessments of weight and credibility. The HOA has not met its burden of showing clear error in the hearing examiner's treatment of community opposition.

B. Compliance with Comprehensive Plan

The HOA argues next that the proposal does not comply with the RCP. The hearing examiner is required to analyze a proposal's compliance with the RCP prior to approving a permit. RZC art. VI, § 21.76.070. The HOA agrees that the hearing examiner's analysis should be reviewed under the "clearly erroneous" standard.

The HOA points first to expert analysis from architect Peter Steinbrueck. It claims that Steinbrueck "demonstrated, via legal analysis, that the proposal was inconsistent with at least fifteen policies in the [RCP] that were not mentioned in the City's Technical Report or the Hearing Examiner's decision at all."

The HOA argues that the hearing examiner erred by not addressing these policies in her findings. It is true that the hearing examiner did not enter detailed findings as to each portion of the RCP Steinbrueck referenced. But, the record shows that hearing examiner considered Steinbrueck's arguments. And, it shows that she was not persuaded by Steinbrueck's interpretations of the RCP. The hearing examiner's rejection of code interpretations by project opponents created a sufficient record for appeal. The HOA's argument that such detailed findings were necessary is without merit.

15

The HOA next points to portions of the RCP that it argues are relevant to the proposal. It argues first that the proposal is inconsistent with RCP policy for the neighborhood of Education Hill (N-EH)-14: "Encourage a mix of housing types, styles, and a range of choices, while maintaining the overall single-family character of established neighborhoods in Education Hill." The HOA concedes that the proposal encourages a mix of housing types. But, it argues that the size and contemporary modern style of the building fails to preserve the single family character of the neighborhood. The hearing examiner was not persuaded by these arguments, finding that the contemporary style was shared by other buildings in the neighborhood. The record supports that finding. While Abbey Road and the broader neighborhood is predominantly single family, there are other large buildings in the neighborhood. And, Emerald Heights had been rezoned from its original R-4 to R-6 to allow this type of residential building.

The HOA also argues the proposal is inconsistent with RCP N-EH-18 and N-EH-19. These policies appear in the section of the plan dedicated to "Cottages and Multiplex[es]." The RCP defines "cottage" as "[a] small detached dwelling unit, not greater than 1,000 square feet in total floor area that is developed at a density greater than the underlying zone." RCP glossary at 5. It defines "multiplex" as "[a] structure that is a two-unit, three-unit, or four-unit attached dwelling, and may also be known as a duplex, triplex, or fourplex." RCP glossary at 13. The proposed assisted living building would be 44,149 square feet and would contain 54 units.

The proposal is not a cottage or a multiplex. This section of the RCP is inapplicable.

The HOA has not met its burden of showing clear error in the hearing examiner's determination that the proposal was consistent with the referenced Comprehensive Plan policies.

C. Compatibility with the Area

The HOA argues the proposal is not compatible with the rest of the area. The hearing examiner is required to consider compatibility with neighborhood character in the issuance of permits. RZC art. VI, 12.76.070(K)(4)(b). The RCP defines "neighborhood character" as

> [t]he various elements of a neighborhood that give it a distinct "personality." Including but not limited to land uses (e.g., residential/commercial mix and population), urban design (e.g. bulk, scale, form), visual resources (e.g. public view corridors and vistas), historic resources (e.g. historic landmarks), natural features (e.g. streams and steep slopes), and physical features (e.g. streets and public places).

RCP glossary at 14. The RCP also describes the character of the Education Hill neighborhood as "primarily residential." RCP N-EH, neighborhood vision at 13-21. A "conditional use . . . may be appropriate on a specific parcel of land within a given zoning district . . . but [is] not appropriate on all parcels within the same zoning district." RZC art. VI, § 21.76.070(K)(1). The hearing examiner's determination of compatibility is a factual determination reviewed under the substantial evidence standard. Timberlake, 114 Wn. App. at 186.

The HOA's primary argument in this regard is that the height, scale, modern design, and location are not compatible with the rest of the neighborhood. It is essentially the same argument it advanced regarding RCP N-EH-14.

The neighborhood contains other large scale buildings, including a high school, church, and other development on the Emerald Heights campus. And, the hearing examiner found that the project had been modified in ways to reduce its apparent size and has screening that exceeds code requirements. Those findings are supported by substantial evidence. The HOA's contention that the mere presence of a large building is incompatible with the character of the neighborhood is belied by the fact that other large "institutional" buildings already exist in the neighborhood.

The hearing examiner also found that the project was compatible with existing development because it has residential-style eaves and windows, materials and colors selected to blend and merge with the surrounding development, exceeded the minimum setback requirements for the majority of the building, and steps were taken to reduce the apparent size of the building. The HOA does not argue that these findings are not supported by substantial evidence, it simply argues that they are not sufficient.

As to the modern design, it may be true that the design differs from the traditional design of Abbey Road homes, but it is consistent with other buildings, most notably the Trailside Building on the southern perimeter of the Emerald Heights campus. The hearing examiner considered the architecture of the

Trailside Building, as well as the fact that its more contemporary design had originally been incorporated at the request of the City. The contemporary style has also been used in many new residential and multifamily designs elsewhere in the neighborhood. The hearing examiner concluded based on these other developments that a contemporary-style building was not "inherently incompatible" with the rest of the neighborhood. That conclusion is supported by substantial evidence.

The HOA has not met its burden of showing the hearing examiner's conclusion that the proposal was compatible with the area is not supported by substantial evidence.

D. Design Standards

The HOA argues that the proposal does not meet the City's design standards. It again points primarily to Steinbrueck's analysis. But, the DRB did its own analysis and concluded that the proposal was compliant with design standards. Steinbrueck expressly disagreed with that analysis. The hearing examiner considered both, and was persuaded that the project complied with applicable requirements.

A difference of opinion is not sufficient to demonstrate clear error of the hearing examiner's determination that the project complied with design standards.

E. Retirement Community Standards

The HOA argues that the proposal does not meet applicable standards for a retirement community primarily because it has an institutional rather than

residential feel, as required by RZC art. I, § 21.08.370(C)(5)(a). But, again, the argument primarily rests on the size of the building. The hearing examiner noted the steps that Emerald Heights took to make the building appear more residential, such as having residential-style eaves and windows. While the building may differ in significant ways from the large single family homes in Abbey Road, it is nevertheless residential in its design and purpose.

The HOA has not demonstrated clear error in the hearing examiner's determination that the building meets applicable retirement community standards.

III.   Conclusion

The hearing examiner carefully considered the opposing positions of the HOA and Emerald Heights. It was not persuaded by the HOA's arguments. But, its findings are supported by substantial evidence. The HOA may disagree with this decision, but it has not met its burden of showing a clear error in the hearing examiner's decision. The superior court's finding to the contrary was error.

We reverse.

_Appelwick, J._

WE CONCUR:

_Chun, J._