# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SPANAWAY CONCERNED CITIZENS, | No. 60984-3-II |
| Appellant, | |
| v. | |
| PIERCE COUNTY; TACOMA RESCUE MISSION; AHBL, INC., | PUBLISHED OPINION |
| Respondents. | |

CRUSER, J.—Spanaway Concerned Citizens appeal the superior court's decision affirming the Pierce County hearing examiner's approval of Tacoma Rescue Mission's planned development district and conditional use permit application. Spanaway Concerned Citizens contends that Tacoma Rescue Mission's application was incomplete and therefore never vested because (1) Tacoma Rescue Mission did not own the entire property and did not get consent from the other property owner, the defunct Drainage District No. 15, and (2) the proposal was inconsistent with the maximum density allowed by the Pierce County Comprehensive Plan at the time the application was submitted.

We conclude that Spanaway Concerned Citizens has failed to demonstrate that the hearing examiner erred because (1) it has not shown that the Drainage District has a settled, unquestioned ownership interest in the land to be developed, and (2) Tacoma Rescue Mission's proposal, which

used the density calculation provisions for sleeping units provided by the Pierce County Code, was consistent with the comprehensive plan. Accordingly, we affirm.

FACTS

I. BACKGROUND

In 2022, the Pierce County Council adopted a comprehensive plan to end homelessness. One of the goals of the plan was to "Expand the Permanent Housing System to meet the need." PIERCE COUNTY COMPREHENSIVE PLAN TO END HOMELESSNESS  3 (Nov. 2021), https://www.pie rcecountywa.gov/DocumentCenter/View/109977/Comprehensive-Plan-to-End-Homelessness-with-Appendices-and-Shelter-Action-Plan.  The plan repeatedly emphasized the need to "[d]evelop and support shared housing units for those unable to afford living alone." *Id.* 16.

A separate document, the Pierce County Comprehensive Plan, set forth the maximum density requirements by zone in terms of dwelling units per acre. PIERCE COUNTY COMPREHENSIVE PLAN 2-31 (July 2023) (PCCP) [https://perma.cc/366G-QEFV]; PIERCE COUNTY CODE (PCC) 18A.15.020.A.1.[1] In October 2022, the Pierce County Council adopted ordinance no. 2022-49s which amended the definition of "Dwelling unit" in PCC 18.25.030 to clarify that "[d]welling unit does not include sleeping units." PIERCE COUNTY ORDINANCE (PCO) 2022-49s, Ex. A at 2. The ordinance defined "[s]leeping unit" as "a private room or suite within shared housing in which persons sleep, and which lacks permanent, individual provisions for either cooking, eating, or sanitation." *Id.* at 6. The ordinance also defined "Shared Housing Village" as "a type of permanent community housing where detached, private living accommodations, primarily in the form of

---

[1] PCC 18A.15.020 has been amended multiple times since the events in this case transpired. Because these amendments do not impact our analysis, we cite to the current version. *Compare* Pierce County Ordinance 2022-49s § 1, *with* Pierce County Ordinance 2025-516s § 4.

sleeping units, are arranged on a site and kitchen and/or sanitary facilities are shared. Shared Housing Village may include some dwelling units." *Id.* at 5. The ordinance provided that "[f]or the Shared Housing Use Type, sleeping units which lack private provisions for cooking, eating, or sanitation shall be equivalent to 0.25 dwelling units for purposes of calculating density." PCO 2022-49s, Ex. B at 1.

In March 2023, the Council enacted ordinance no. 2023-5s, which authorized shared housing villages in the residential resource zone for the Parkland-Spanaway-Midland community plan area. PCO 2023-5s at 3. Spanaway Concerned Citizens (SCC) appealed the ordinance to the growth management hearings board and, in a settlement agreement, the Council agreed to repeal the ordinance. The ordinance would no longer be in effect as of December 1, 2023. *See* PCO 2023-42s.

## II. Tacoma Rescue Mission's Application

In May 2023, after ordinance no 2023-5s went into effect, but before it was repealed, Tacoma Rescue Mission (TRM) applied for a planned development district and conditional use permit to build a shared housing village. The shared housing village (Village) would serve Pierce County's chronic homeless population. The Village would be built on 86.32 acres located in the Parkland-Spanaway-Midland community plan area. Because 13.61 acres of the subject property are environmentally constrained, only 72.71 acres are developable. The property is in the "Residential Resource" zone and has a maximum allowable density of 3 dwelling units per acre, subject to planned development district approval. PCCP 2-31 (July 2023); PCC tbl. 18A.15.020-1. Therefore, the maximum number of dwelling units allowed on TRM's parcel is 218. The Village would include 189 park model style recreational vehicles, 96 micro sleeping units, and 4 single

family dwellings. The Village would also provide communal bathrooms, laundry, and cooking facilities.

TRM's application included a signed attestation by an agent of TRM that TRM had the legal right to begin the permitting process for the proposed development project. TRM also submitted a statutory warranty deed, dated May 8, 2023, conveying the entire parcel, without exception to TRM and proof of title insurance.

The Pierce County Department of Planning and Public Works deemed TRM's application complete on July 6, 2023.

III. CHALLENGE BEFORE THE HEARING EXAMINER

On November 16, 2023, Pierce County issued a mitigated determination of nonsignificance (MDNS) related to TRM's planned project. In December 2023, SCC appealed the MDNS for the project. The hearing on the appeal of the MDNS was consolidated with the hearing on the approval of the planned development district and conditional use permit application. The MDNS challenge is not at issue on appeal.

Before the Pierce County hearing examiner, SCC argued that TRM's planned development district/conditional use permit application did not vest because (1) TRM did not own the entire property and did not get consent from the other property owner, the defunct Drainage District No. 15, and (2) the proposal was inconsistent with the maximum density allowed by the comprehensive plan at the time the application was submitted. SCC alleged that TRM never acquired title to a 720-foot-long, 25-foot-wide strip of land that was conveyed to the now-defunct Drainage District No. 15 in a 1920 superior court order for the purpose of constructing a drainage ditch. TRM argued that the Drainage District only ever acquired an easement to construct a ditch on the property.

4

TRM further contended that even if the Drainage District retained some ownership of the property, the strip and areas around it are critical areas that will not be disturbed or developed by the project.

The hearing examiner found that TRM's application vested to the version of the code in effect on the day the planned development district and conditional use permit application was filed, May 23, 2023, and approved TRM's application. With regard to SCC's argument that the application was incomplete because it was missing an attestation by all owners of the subject property, the hearing examiner concluded that the Drainage District did not have a fee interest in the land, but merely an easement to build a drainage ditch. The hearing examiner further concluded that the proposal was compliant with the density requirements of the Pierce County Code and with the version of the comprehensive plan in effect on the date the proposal vested. In reaching this conclusion, the hearing examiner reasoned,

> [s]leeping units, by definition in PCC 18.25.030, lack provisions for cooking, eating, or sanitation. For that reason, they cannot be called dwelling units, which by definition in PCC 18.25.030, have facilities for living, sleeping, eating, cooking, and sanitation. The 300 square-foot sleeping units the Applicant proposes are not merely scaled-down versions of single-family houses or other, more traditional dwelling units. The sleeping units provide a fundamentally different living experience, in which residents must walk outside to reach a shower building or a kitchen. Of course, sleeping units still do have density impacts and so it would be a mistake to ignore sleeping units altogether when calculating project densities. The Hearing Examiner finds that the 1:4 conversion provided in PCC 18A.45.030.A is a reasonable conversion ratio and is consistent with the Comprehensive Plan and with the underlying zoning density limits in PCC 18A.15.020.

Clerk's Papers (CP) at 38.

The hearing examiner approved TRM's planned development district and conditional use permit.

5

IV. Motion for Reconsideration and Land Use Planning Act Appeal

SCC filed a motion for reconsideration. The hearing examiner denied this request. SCC appealed the hearing examiner's decisions to the superior court under the Land Use Planning Act (LUPA).[2] The superior court affirmed the hearing examiner. SCC appeals.

DISCUSSION

I. Legal Principles

A. LUPA Appeals

We sit in the same position as the superior court when reviewing the superior court's decision under LUPA and we review the record before the hearing examiner. *Miller v. City of Sammamish*, 9 Wn. App. 2d 861, 870, 447 P.3d 593 (2019); RCW 36.70C.120(1). The party seeking relief under LUPA has the burden of establishing that one of the standards set forth in RCW 36.70C.130(1)(a) through (f) has been met. RCW 36.70C.130(1). As relevant to this appeal, those standards are:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
>
> (d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1). We review questions of law de novo. *Miller*, 9 Wn. App. 2d at 869. Evidence is substantial where it is sufficient to persuade a reasonable person that the premise is true. *Id.*

---

[2] Ch. 36.70C RCW.

B. Vesting Requirements

The Pierce County Code defines "[v]esting" as "the establishment of a date that is used to determine which development regulations the Department and Hearing Examiner will apply to the review of a complete application or approved development permit." PCC 18.25.030.[3] An application vests when it is deemed complete. PCC 18.160.050.D. An application is considered complete when it contains, among other things, a

> [s]igned attestation by applicant or authorized agent with regard to applicant's title, legal interest, or contractual right to any real property that the applicant's application for land use permits proposes to develop ("subject property").
>
> a. If the applicant is the owner of the subject property, the application must attest that the applicant holds title to the subject property.

Former PCC 18.40.020.C. 2 (2021).

Former PCC 18.40.020.B states that "[p]roposals that are inconsistent with the use and/or density provisions of the Comprehensive Plan and/or development regulations shall not be accepted." The PCC does not define the term "accepted." *See* PCC 18.25.030.

## II. ATTESTATION OF OWNERSHIP VESTING REQUIREMENT

SCC contends that TRM's application was not complete and therefore did not vest because the defunct Drainage District No. 15 owned a portion of the land and TRM did not obtain its consent. TRM argues that SCC's vesting arguments are untimely, that SCC does not have standing to challenge TRM's title to the subject property and the examiner was without jurisdiction to decide TRM's ownership rights, and that the hearing examiner correctly concluded that TRM was

---

[3] PCC 18.25.030 has been amended multiple times since the events in this case transpired. Because these amendments do not impact our analysis, we cite to the current version. *Compare* PCO 2022-49s § 1, *with* PCO 2025-571 § 2.

not required to get the Drainage District's consent because the 1920 decree conveyed only an easement to the District. We conclude that the hearing examiner did not err because SCC has not demonstrated that the Drainage District owned the ditch property.

SCC has the burden of demonstrating that the hearing examiner erred. RCW 36.70C.130(1). Here, SCC's contention that the Drainage District owned the ditch property in fee simple is only supported by an ambiguous 1920 superior court order allowing the District to construct the ditch. This order is not a binding, recorded interest in the property. SCC has not presented evidence that the Drainage District has a continuing, settled, and unquestioned ownership interest in the land to be developed such that their approval was required for the application to vest.

Moreover, as TRM notes, the drainage ditch is located within an undevelopable wetland that is immaterial to TRM's development project. To vest, TRM needed to provide a "[s]igned attestation by applicant or authorized agent with regard to applicant's title, legal interest, or contractual right to any real property that the applicant's application for land use permits *proposes to develop*." Former PCC 18.40.020.C.1 (emphasis added). Here, TRM did not propose to develop the wetland property, which was undevelopable and not included in the density calculation. PCC

18A.15.020.A.2.a.1, b. Thus, SCC has not met its burden of demonstrating that the hearing examiner erred by concluding that TRM's application vested.[4]

### III. CONSISTENCY WITH COMPREHENSIVE PLAN VESTING REQUIREMENT

SCC argues that TRM's application did not vest because the proposal is inconsistent with the maximum density allowed by the comprehensive plan. Specifically, SCC contends that the hearing examiner erred as a matter of law by applying the density calculation for sleeping units from the Pierce County Code to conclude that TRM's application was consistent with the comprehensive plan. We disagree.

Under the Growth Management Act, most counties are required to "adopt a comprehensive plan . . . and development regulations that are consistent with and implement the comprehensive plan." RCW 36.70A.040(3). Our supreme court has recognized that comprehensive plans serve as a "guide" or "blueprint" for land use decisions, and that land use regulations must generally

---

[4] TRM argues that neither this court nor the hearing examiner has "jurisdiction" to decide TRM's ownership rights. Br. of Resp't TRM at 46. TRM similarly argues that SCC lacked standing to challenge TRM's title. As an initial matter, TRM misuses the term "jurisdiction" when it is plainly referring to the hearing examiner's authority. TRM concedes that the determination of whether an application is complete is a land use decision, and both the hearing examiner and the superior court, as well as this court, have both jurisdiction and statutory authority to decide LUPA cases. *See* RCW 36.70C.030, .020(2)(b).

To determine whether an application has vested, the hearing examiner must determine whether the county was correct in deeming the application complete. PCC 1.22.080.B, 18.160.050. Accordingly, the hearing examiner has the authority to examine any issues related to vesting, and the challenger of the land use decision has standing to argue any issue that would be determinative of that question, to include examining whether the county was correct in deeming the application complete. TRM inaccurately recharacterizes SCC's challenge as, essentially, a quiet title action. SCC did not ask the hearing examiner, the superior court, or this court to settle a title dispute between parties claiming an ownership interest in the parcel purchased by TRM, but rather contended that the evidence clearly showed that the Drainage District held title to a portion of the property—an assertion we reject. For this reason, TRM's argument that SCC lacked standing to challenge TRM's claim of title likewise fails because that is an inaccurate characterization of what SCC asked the hearing examiner to do.

conform with the comprehensive plan rather than strictly adhere to it. *See Fall City Sustainable Growth v. King County*, 34 Wn. App. 2d 383, 393, 568 P.3d 1129 (2025) (discussing *Woods v. Kittitas County*, 162 Wn.2d 597, 612-14, 174 P.3d 25 (2007)).

Here, the PCCP states that residential resource zoned areas should develop at densities of "1 to 3 [dwelling] units per acre." PCCP 2-31 (July 2023). SCC argues that the Comprehensive plan defines dwelling unit when it states:

> Housing is typically thought of in terms of multifamily apartment developments, duplexes and triplexes, and single-family homes. It includes stick-built homes, modular housing, manufactured housing, and mobile homes. The arrangement of dwelling units includes traditional units, accessory units, and a variety of non-traditional housing techniques designed to provide for people's wants and needs at a wide range of costs.

PCCP 9-2 (July 2023). This language, in the introduction of the housing element of the PCCP, illustrates the ways in which dwelling units are typically arranged. It does not define "dwelling unit." Indeed, no provision of the comprehensive plan defines "dwelling unit." "Dwelling unit" is defined in the Pierce County Code to include "permanent provisions for living and sleeping, kitchen facilities, and sanitation facilities"; sleeping units, by definition, lack these provisions. PCC 18.25.030. Nothing in the comprehensive plan prevents the council from establishing a methodology to limit the density implications of housing forms that do not meet the definition of "dwelling unit." As the hearing examiner observed, "sleeping units provide a fundamentally different living experience, . . . Of course, sleeping units still do have density impacts and so it would be a mistake to ignore sleeping units altogether when calculating project densities." CP at 38. We agree with the hearing examiner's finding that "the 1:4 conversion provided in PCC 18A.45.030.A is a reasonable conversion ratio." *Id.* This conversion ratio is consistent with the

10

PCCP and with the comprehensive plan to end homelessness' goal of developing and supporting shared housing units. Thus, TRM's application vested at the time it was deemed complete.

ATTORNEY FEES

TRM and Pierce County request attorney fees under RCW 4.84.370, which provides for an award of attorney fees and costs to the prevailing party in an appeal of a land use decision. We hold that TRM and Pierce County are entitled to attorney fees.

RCW 4.84.370(1) provides that a prevailing party on appeal of a land use decision by a county or city shall be awarded attorney fees and costs if "(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town . . . ; and (b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings."

Because TRM and Pierce County prevailed before the hearing examiner, the superior court, and this court, they are entitled to attorney fees under RCW 4.84.370(1) in an amount to be determined by the court commissioner.

CONCLUSION

We conclude that SCC has failed to demonstrate that the hearing examiner erred because (1) it has not demonstrated that the Drainage District has a settled, unquestioned ownership interest in the land to be developed, and (2) TRM's proposal, which used the density calculation provisions for sleeping units provided by the Pierce County Code, was consistent with the Comprehensive Plan. Accordingly, we affirm and award TRM and Pierce County attorney fees under RCW 4.84.370(1).

No. 60984-3-II

CRUSER, J.

I concur:

GLASGOW, J.

VELJACIC, C.J. (concurring) — I agree with my colleagues in the majority that Tacoma Rescue Mission's (TRM's) proposal is consistent with Pierce County's Comprehensive Plan. I also agree that TRM's application should not have been denied for lack of ownership of the entirety of the subject property.

I write separately because, in my view, TRM satisfied the application's requirements by attesting to its ownership. The hearing examiner lacked authority to conduct a title examination beyond confirming that an attestation was made by the owner.

Pierce County Code (PCC) 18.40.020(C) directs Pierce County Public Works to review a land use application to determine whether the required components have been included before deeming the application complete. Among those required components is a signed attestation regarding the applicant's title, legal interest, or contractual right to the subject property. As TRM[5] points out, PCC 18.40.020(C) directs Pierce County Public Works to "check" a submitted land use application to confirm that components are included therein before it is determined to be complete. The provision does not require investigation into the accuracy and truthfulness of the information provided.

---

[5] TRM couches its argument in terms of standing and jurisdiction, even calling into question this court's jurisdiction at one point in its brief. We need not address standing or jurisdiction, as an analysis of the hearing examiner's authority is sufficient to resolve the question here. Moreover, we use the term "authority," rather than "jurisdiction," where possible to avoid confusion. The United States Supreme Court has recognized that "jurisdiction" is "a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998). Likewise, our Supreme Court has observed that the "improvident and inconsistent" use of the term "subject matter jurisdiction" has led courts to conflate true jurisdictional questions with issues concerning the authority to act in a particular manner. *Marley v. Dep't of Lab. & Indus.*, 125 Wn.2d 533, 539, 886 P.2d 189 (1994).

TRM provided the necessary attestation. In addition, and not required by the ordinance, TRM provided a statutory warranty deed. Under the plain language of the ordinance, the attestation was enough to satisfy that portion of the permit; the deed was more.

The Pierce County Hearing Examiner's powers are set out in PCC 1.22.080. They are limited to determining whether a particular application for development is consistent with applicable law for the type of development at issue. Nowhere in PCC 1.22.080 does it enumerate that the hearing examiner may litigate claims to title.

Indeed, no authority exists providing that the hearing examiner may litigate title to property. There would be grave disorder to our system of title ownership and conveyance if a land use hearing examiner were allowed to deprive an owner of title without due process protections commensurate with such a deprivation. Moreover, a hearing examiner would lack any ability to provide a remedy should the examiner declare title is in one other than the purported owner; the examiner cannot require issuance of a deed. Litigating title outside of a court of law could amount to a cloud to title. *See Robinson v. Khan*, 89 Wn. App. 418, 423, 948 P.2d 1347 (1998); RCW 7.28.100. The hearing examiner erred by effectively litigating title; Spanaway Concerned Citizen's attempted challenge to TRM's title in order to prevent vesting should fail on this basis without an analysis of the merits of the hearing examiner's decision regarding title.

_____
Veljacic, C.J.